**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THERESA A. SEALE, | ) | CASE NO. 1:16CV1763 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Theresa A. Seale ("Plaintiff" or "Seale"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In June 2013, Seale filed applications for POD, DIB, and SSI, alleging a disability onset

_____

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

date of May 13, 2013 and claiming she was disabled due to fibromyalgia, degenerative arthritis, sciatica, gastritis, "cyst on ovaries," and eczema.  (Transcript ("Tr.") 18, 202, 208, 238.)  The applications were denied initially and upon reconsideration, and Seale requested a hearing before an administrative law judge ("ALJ").  (Tr. 125-142, 144-156, 157-159.)

On June 17, 2015, an ALJ held a hearing, during which Seale, represented by counsel,[2] and an impartial vocational expert ("VE") testified.  (Tr. 35-59.)  On July 16, 2015, the ALJ issued a written decision finding Seale was not disabled.  (Tr. 18-34.)  The ALJ's decision became final on May 5, 2016, when the Appeals Council declined further review.  (Tr. 1-6.)

On July 11, 2016, Seale filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15.)  Seale asserts the following assignments of error:

> (1)  The RFC is unsupported by substantial evidence and the product of legal error in that it fails to provide "good reasons" for dismissing the opinion of Plaintiff's treating physician, Dr. Bhatia.
>
> (2)  The ALJ's credibility determination was not supported by substantial evidence and was the product of legal error.

(Doc. No. 13.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Seale was born in May 1979 and was thirty-six (36) years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr.

---

[2] In the decision, the ALJ states that Seale was represented by James R. Shaw, a non-attorney representative.  (Tr. 18.)  At the hearing, however, it is noted that Seale was represented "James Ferguson, claimant attorney."  (Tr. 35.)

2

28.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  She has a limited education and is able to communicate in English.  (*Id.*)  She has past relevant work as a janitor and cleaner.  (Tr. 27.)

**B.      Relevant Medical Evidence[3]**

On November 19, 2012, Seale presented to pain management specialist Joseph Abdelmalak, M.D., for an initial evaluation.  (Tr. 337-342.)  She complained of neck pain, left upper extremity pain, back pain and stiffness, headaches, left hand numbness, depression, and sleep disturbance.  (Tr. 337, 339.)  Seale stated her pain started two years previously, and described it as "aching, burning, numbness and shooting, hurts when skin is touched."  (Tr. 337.)  She rated the pain a 10 on a scale of 10 and stated it was aggravated by lifting and using her left arm.  (*Id.*)  Dr. Abdelmalak noted a previous medical history of fibromyalgia and degenerative arthritis in the lumbar region, as well as the results of a July 2010 MRI of Seale's lumbar/thoracic spine showing mild degenerative disc disease at T3-4 at L5-S1.  (Tr. 338, 340.)

On examination, Dr. Abdelmalak noted "tenderness over multiple muscular points–supraclavicular, cervical, thoracic, and lumbar spine," as well as "hypersensitivity to touch over the left mid thoracic area, left flank around to under the left breast and left upper extremity."  (Tr. 340.)  He also noted normal gait, and 5/5 motor strength and tone throughout.  (*Id.*)  In his assessment, Dr. Abdelmalak stated Seale "rates her pain at 10+/10, but there are no signs of severe pain."  (*Id.*)  He diagnosed neuropathic pain and intercostal neuralgia; prescribed Cymbalta, Neurontin, and Lidocaine cream; and scheduled a left intercostal nerve block under ultrasound guidance.  (*Id.*)  Seale underwent the nerve block procedure on November 30, 2012.

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the records identified in the parties' Briefs.

3

(Tr. 333-334.)

On December 14, 2012, Seale returned to Dr. Abdalmalak for "a follow up appointment for fibromyalgia (bilateral shoulder pain)."  (Tr. 348-351.)  She complained of aching, intermittent bilateral shoulder pain that "does not radiate," as well as back pain and numbness/tingling on the left side of her face and arm.  (Tr. 348-349.)  Seale rated the pain a 4 to 5 on a scale of 10, and stated it was aggravated by stress and mitigated by medications.  (*Id*.) She reported "marked improvement in pain and marked improvement in function" since her last visit.  (Tr. 348.)  In particular, Seale indicated the nerve block procedure had resulted in 50% pain relief and a "great increase in function till now."  (Tr. 349.)  On examination, Dr. Abdelmalak noted (1) tenderness over the supraclavicular and infraclavicular area; (2) tenderness over the trapezius muscles bilaterally; (3) multiple points of tenderness over the thoracic and lumbar paraspinal muscles; and (4) normal gait.  (*Id*.)  He assessed myalgia, myositis, and fibromyalgia; continued Seale's medications; and recommended physical therapy/aquatherapy.  (Tr. 350.)  Seale declined the therapy "as she reports she cannot do it." (*Id*.)

Seale returned to Dr. Abdelmalak on February 13, 2013 with complaints of pain in her left shoulder, left arm, and back.  (Tr. 352-357.)  She characterized the pain as aching, shooting, and constant, and rated it a 7 on a scale of 10.  (Tr. 352.)  Seale reported 100% pain relief for two months with the nerve block, and "now 25%."  (Tr. 353.)  Physical examination findings were unchanged from her December 2012 appointment.  (Tr. 354.)  Dr. Abdelmalak assessed myalgia, myositis, and fibromyalgia; continued Seale's medications; and recommended trigger point injections.  (*Id*.)  Seale agreed to the injections, which were administered that day.  (Tr.

4

354–355.)

On May 17, 2013, Seale presented to Dr. Abdelmalak with complaints of pain in her "neck, right lower and upper extremity . . . radiat[ing] to right lower extremity, right upper extremity along anterior aspect to the level of ankle," along with bilateral shoulder, bilateral wrist, right elbow, right knee, and back pain.  (Tr. 358-360.)  She described the pain as constant, aching, numbness and tingling, and rated it an 8 on a scale of 10.  (Tr. 358.)  Seale also reported headaches and numbness/tingling in her right hands and feet.  (Tr. 359.)  On examination, Dr. Abdelmalak noted (1) tenderness over the bilateral cervical paraspinal and trapezius muscles; (2) tenderness on palpation over the lumbar spine; (3) tenderness over the bilateral SI joints; and (4) right knee pain with range of motion and tenderness over the posterior aspect.  (Tr. 360.)  He assessed fibromyalgia and knee joint pain; adjusted Seale's medications; and recommended repeat trigger point injections.  (*Id*.)  Seale agreed, and injections were administered that date. (Tr. 360-361.)

Seale returned to Dr. Abdalmalak on June 10, 2013 with complaints of "all over body pain."  (Tr. 364-368.)  She stated the pain started two months previously; characterized it as pinching and constant; and rated in a 9 on a scale of 10.  (Tr. 364.)  Seale indicated the previous trigger point injections were ineffective; stated her pain was aggravated by standing, lifting, lying down and walking; and was unable to pinpoint any positions/factors that were mitigating. (Tr. 364, 366.)  She also complained her right leg "gives out on me, feels like lead."  (Tr. 365.) Examination revealed the following: (1) tenderness over the muscles of the cervical, thoracic, and lumbar muscles; (2) facet loading test positive bilaterally; (3) straight leg raise on the right causes pain in the right quadracept muscle; (4) right shoulder pain; (5) tenderness over the lateral

5

aspect of the right elbow with palpation and flexion; (6) tenderness over the median, ulnar and radial nerves of the right wrist; (7) right knee tenderness with palpation; (8) right greater trochanteric bursa tenderness; and (9) antalgic gait.  (Tr. 366.)  Dr. Abdelmalak assessed fibromyalgia, myalgia and myositis, right shoulder pain and right knee pain.  (*Id*.)  He adjusted Seale's medications, advised her to start aqua therapy, and referred her to a rheumatologist.  (*Id*.)

On June 13, 2013, Seale began treatment with primary care physician Mudita Bhatia, M.D.  (Tr. 373-378.)  She reported a history of fibromyalgia ("diagnosed in 2007") and presented "to establish new care and have disability and FMLA paperwork filled out."  (Tr. 373.)  Dr. Bhatia recorded Seale's complaints as follows:

> She complains of significant aches throughout her whole body, from head-to-toe - symptoms worst in her shoulders and hips.  No relief with medications, therapy, or injections.  Has tried several different medications (Tramadol did not work, Neurontin caused weight gain).  Now on Cymbalta, Naproxen (started a few days ago), and Topamax (last month).  Per patient, has had several injections by pain management over past year but minimal relief.  She reports that symptoms of fibromyalgia have worsened over the past year since divorce from abusive husband last year.  Last day of work was May 13 – boss told her to go home after patient was unable to perform duties.  Patient fearful of being fired and not having financial stability.  Patient denies other symptoms. . . Pt says that she even has trouble lifting her hair dryer due to pain and she lifts heavy stuff at workplace.

(*Id*.)  Examination revealed (1) resting tremor in both arms; (2) "18 point tenderness (bilateral SCM, trapezius, sub-occipital, epicondylar, hips/greater trochanter, medial fat pad of knee, supraspinatus, outer buttocks);" (3) diminished range of motion throughout (unable to abduct arms past 90 degrees) due to pain; and (4) "significant limping on gait- weakness evident on right leg > left."  (Tr. 374.)  Dr. Bhatia assessed fibromylagia, ordered blood work, and completed Seale's FMLA paperwork.  (Tr. 375.)  She also noted "short-term disability paperwork also completed."  (*Id*.)

6

On that same date, Dr. Bhatia completed a "Medical Source Document" regarding Seale's Physical Capacity.  (Tr. 380.)  Dr. Bhatia indicated a diagnosis of fibromyalgia and stated Seale's impairments had persisted for seven years.  (*Id*.)  She opined Seale could (1) sit for less than 2 hours in an 8 hour workday; (2) stand/walk for less than 2 hours in an 8 hour workday; (3) occasionally lift and carry less than 5 pounds; and (4) walk for less than one city block without rest or severe pain.  (*Id*.)  Dr. Bhatia found Seale was restricted in her abilities to bend forward, walk, and change positions.  (*Id*.)  She concluded Seale's pain or other symptoms would frequently interfere with her attention, concentration, persistence and pace.  (*Id*.)  Dr. Bhatia indicated emotional factors contributed to the severity of Seale's symptoms and functional limitations, and found Seale was moderately limited in her ability to deal with work stress.  (*Id*.)  She concluded Seale would be absent from work more than three times a month as a result of her impairments, and that "the cumulative effects of all [Seale's] medical problems, psychological problems and symptoms [would] allow her to work" zero hours per day.  (*Id*.)  Dr. Bhatia found Seale's prognosis for marked improvement or complete recovery was "fair," and her prognosis for ability to return to work was "not good."  (*Id*.)  Finally, Dr. Bhatia indicated Seale's impairments lasted or could be expected to last at least twelve months and, further, that she was likely to experience more medical problems that would increase her limitations.  (*Id*.)

Seale began physical therapy on June 12, 2013.  (Tr. 404-407.)  She complained of all over body pain, hand tremors, and occasional numbness and tingling in her feet.  (Tr. 404.) Seale rated her pain a 7 on a scale of 10, and reported "difficulty performing most activities, bending, dressing, grooming, physical activities, reaching behind back, and driving."  (Tr. 405.) She demonstrated "extreme anxiousness" during the evaluation and a "decreased ability to

relax." (*Id*.)  Examination revealed increased pain with active range of motion of Seale's cervical spine, upper and lower extremities, and lumbar spine; and strength limitations secondary to the pain.  (Tr. 406-407.)  The physical therapist also noted antalgic gait, stating "pt ambulates with slow cadence, head down, hands clasped together, apprehension with movements."  (Tr. 406.)  Seale returned two days later, on June 14, 2013, at which time she began aquatic therapy.  (Tr. 402-404.)  She was "slow moving and apprehensive," but "responded well to the pool" and reported decreased pain.  (Tr. 404.)  Seale presented for aqua therapy on June 24, 2013 and again reported decreased pain.  (Tr. 400-402.)

On July 1, 2013, Seale presented to Nazih Zein, M.D., for rheumatologic evaluation.  (Tr. 383-387.)  Seale described her symptoms as follows: "A lot of pain (7 yrs).  Shaking hands.  Right leg feels heavy, can't drive (May 20th).  Right arm feels like [it's] on fire and a rubber band after wrist and on my right leg.  Whole body is numb always.  Can't pick up any[thing] over 5 lbs or I drop it.  Been out of work since May 13.  Can't sleep."  (Tr. 385.)  On examination, Dr. Zein noted multiple tender points but no synovitis or deformities.  (Tr. 387.)  Seale's hands were shaking intermittently.  (*Id*.)  Dr. Zein concluded Seale's "musculoskeletal exam was otherwise unreliable because of resistance to range of motion and give way response to motor exam."  (*Id*.)  He diagnosed fibromyalgia and noted "she has been quite refractory to numerous treatments."  (*Id*.)  Dr. Zein concluded as follows:

> At this point, I have nothing to add to what has already been done.  I did suggest to her multidisciplinary evaluation at the Cleveland Clinic and psychiatric evaluation.  She was not receptive.  When I indicated that I have not much to add she was quite upset and left the office angry and crying.

(*Id*.)

Seale returned to Dr. Bhatia on July 15, 2013.  (Tr. 436-439.)  She complained of "severe

pain all over" and requested a handicap parking placard.  (Tr. 436.)  Seale indicated she was not

currently taking any pain medication, and stated "they day she does aquatics she feels good."

(*Id*.)  On examination, Dr. Bhatia noted Seale was "very upset, talks rapidly, resting tremor both

arms," and tearful.  (*Id*.)  She observed 18 point tenderness but no lower extremity edema.  (*Id.*)

Dr. Bhatia assessed fibromyalgia; provided a handicap placard for six months; and advised Seale

to see a psychiatrist.  (Tr. 438.)

Seale continued aqua therapy in July and August 2013.  (Tr. 392-400.)  On July 8, 2013,

Seale reported slight improvement.  (Tr. 398.)  On July 15, 2013, Seale reported "full body pain

at 10+/10" and stated "the only thing that helps is being in the water multiple days in a row."

(Tr. 396.)  Seale also indicated "she has a high pain tolerance, that is why she can smile and

laugh with 10+/10 pain."  (*Id*.)  Physical therapist James Badowski, P.T., noted Seale was

"without demonstration of pain behavior before, during, or after" the session.  (Tr. 398.)

On July 29, 2013, Seale returned for aqua therapy with continued complaints of increased

pain on the right side of her body, in both her upper and lower extremity.  (Tr. 393-395.)  Mr.

Badowski noted Seale "continues to be inconsistent with reporting of pain."  (Tr. 395.)  On

August 27, 2013, Seale complained of 10/10 pain and indicated she had not slept due to pain for

the last two weeks.  (Tr. 392.)  Mr. Badowski concluded as follows:

> Pt is not consistent with [home exercise program], and does not demonstrate
> typical pain behaviors.  Pt smiles frequently throughout session and transfers
> easily.  Pt also provides limited force production during [manual muscle testing],
> pt only provides enough force to match force provided by [physical therapist].  Pt
> is not appropriate for skilled [physical therapy].  Recommend pain management.

(Tr. 393.)

On September 10, 2013, Seale began treatment with rheumatologist Margaret Tsai, M.D.

9

(Tr. 414-427.)  Seale reported pain in her shoulders, back, and joints; difficulty walking and lifting her arms above her head; knee swelling and weakness; and feeling "foggy," and sleepy. (Tr. 414–415.)  On examination, Dr. Tsai noted Seale "ambulates well without assistance or assistive devices."  (Tr. 416.)  She noted 16 out of 18 tender points, but no edema or variscosities in Seale's extremities.  (*Id*.)  Musculoskeletal examination revealed no joint deformities, no SI tenderness, no Achille's tenderness, no heel/plantar tenderness, full lumbar flexion, no knee effusions, full range of motion in all upper and lower extremity joints, and negative Schober's, Tinel's, and Finkelstein tests.  (Tr. 417.)  Dr. Tsai did note diffuse tenderness in Seale's shoulders, elbows, upper extremities, ankles, knees, and back.  (*Id*.)  Seale's motor strength was 5/5 proximally and distally bilaterally; her sensation was intact to fine touch; and her gait was "normal without assistive devices."  (*Id*.)  Seale's muscle tone and pulses were also normal.  (*Id*.)

Dr. Tsai diagnosed fibromyalgia, multiple joint pain, Vitamin D deficiency, fatigue, degenerative disc disease, and back pain.  (*Id*.)  She ordered blood work for inflammatory diseases, started Neurontin, and recommended Seale "start weightbearing exercise as tolerated." (*Id.*)  Dr. Tsai recommended Seale "avoid high impact exercises such as jumping, running, jogging, or movements where you bend forward and twist the waist, for instance – touching your toes, sit-ups, using row machine."  (Tr. 418.)  She also ordered an x-ray of Seale's shoulders, which was normal.  (Tr. 427, 517.)

Seale returned to Dr. Bhatia on September 12, 2013 for follow up regarding her fibromyalgia.  (Tr. 433-435.)  Seale complained of poor sleep and was "very anxious."  (Tr. 433.)  Dr. Bhatia declined to prescribe any sleep aids "for now as just started on Neurontin." (Tr. 434.)

On November 19, 2013, Seale returned to Dr. Tsai complaining of all over body pain, which she rated a 7 on a scale of 10. (Tr. 487-494.) She continued to report poor sleep, and indicated she "needs new pain management team." (Tr. 487.) On examination, Dr. Tsai noted 15 out of 18 tender points. (Tr. 488.) All other physical examination findings were the same as in Seale's previous visit. (Tr. 488-489.) Dr. Tsai increased Seale's Neurontin dosage, and continued to recommend weight bearing, non-high impact exercise. (Tr. 489-490.)

On December 20, 2013, Seale began treatment with Angela Ritchey, D.O. (Tr. 454-458.) Seale complained of "pain throughout her whole body, but mostly the upper extremities, neck, and shoulder region." (Tr. 454.) She reported that, since July of that year, she noticed decreased grip strength in her right hand and a "knot" in her right thigh when she drives or walks. (*Id.*) She also complained "her leg will give out occasionally." (*Id.*) Seale indicated she could not wash dishes or do laundry due to hand pain. (*Id.*) On examination, Dr. Ritchey noted (1) "pain to palpation when touching anywhere on the back, shoulders, or chest;" (2) trace bilateral lower extremity edema; and (3) decreased grip strength and range of motion of the upper extremities. (Tr. 455.) She diagnosed fibromyalgia, right arm weakness, and right leg weakness; and referred Seale to a neurologist. (Tr. 456.)

Seale returned to Dr. Abdelmalak on January 17, 2014. (Tr. 469-473.) She complained of all over body pain, which she described as constant and rated a 10 on a scale of 10. (Tr. 469.) Examination revealed (1) diffuse muscle tenderness throughout Seale's body; (2) shoulder pain with range of motion, right greater than left; (3) right elbow pain with range of motion; and (4) normal gait. (Tr. 471.) Dr. Abdelmalak added Mobic to Seale's medication regimen, and recommended that she continue aqua therapy. (*Id.*)

11

Several days later, on January 20, 2014, Seale returned to Dr. Ritchey with complaints of pain in her left lower back, radiating down the back of her leg to the knee.  (Tr. 459-462.)  On examination, Dr. Ritchey noted left lower lumbar paraspinal muscle spasm, trace edema in Seale's bilateral lower extremities, normal lower extremity muscle strength, residual tingling on the right lower extremity, and pain with extension of the left leg.  (Tr. 460.)  Dr. Ritchey assessed sciatica of the left side; prescribed Prednisone; and renewed Seale's handicap placard.  (*Id*.)

Seale returned to Dr. Ritchey on January 30, 2014.  (Tr. 464-467.)  She reported the Prednisone had provided some relief, but "last night, pt was laying down when she stood up she felt the burning sensation on the left side that radiates to her buttocks down the back of leg to the knee."  (Tr. 464.)  Examination findings were the same as in Seale's previous visit, along with findings of normal bilateral patellar reflexes and negative straight leg raise on the right.  (Tr. 465.)  Dr. Ritchey referred Seale to physical therapy for a consult.  (*Id*.)

On March 17, 2014, Seale returned to Dr. Abdelmalak with complaints of all over body pain with "shoulders and arms the worst."  (Tr. 474-478.)  She rated her pain a 6 on a scale of 10, and stated it was aggravated by standing, forward flexion, lifting and walking.  (Tr. 474.)  Seale indicated the Mobic had helped to decrease her "burning pain" and, further, that she was currently in aqua therapy for her low back pain.  (Tr. 476.)  Dr. Abdelmalak noted Seale had gained a significant amount of weight (60 pounds) over the last year, and referred her to the Bariatric Institute for a consult regarding weight loss.  (*Id*.)  He also recommended Seale discuss with Dr. Tsai the possibility that Neurontin was contributing to her weight gain.  (*Id*.)

On May 20, 2014, Seale presented to Dr. Tsai for follow up regarding her fibromyalgia.

12

(Tr. 495-506.)  She reported numbness and tingling all over her body and indicated her left lower

extremity is "a new spot." (Tr. 495.)  Seale stated she could no longer afford aqua therapy, but

had started the bariatric program and "already lost 3 pounds."  (*Id*.)  On examination, Dr. Tsai

noted Seale "ambulates well without assistance or assistive devices."  (Tr. 496.)  She noted 14

out of 18 tender points, but no edema or variscosities in Seale's extremities.  (Tr. 497.)

Musculoskeletal examination revealed no joint deformities, no SI tenderness, no Achille's

tenderness, no heel/plantar tenderness, full lumbar flexion, no knee effusions, full range of

motion in all upper and lower extremity joints, and negative Schober's, Tinel's, and Finkelstein

tests.  (*Id*.)  Dr. Tsai did note diffuse tenderness in Seale's shoulders, elbows, upper extremities,

ankles, knees, and back.  (*Id*.)  Seale's motor strength was 5/5 proximally and distally bilaterally;

her sensation was intact to fine touch; and her gait was "normal without assistive devices."  (*Id*.)

Seale's muscle tone and pulses were also normal.  (*Id*.)  She recommended Seale continue with

the bariatric weight loss program, and perform weight bearing exercises as tolerated.  (*Id*.)

Seale returned to Dr. Ritchey on July 21, 2014 for a six month follow up visit.  (Tr. 508-

514.) She reported that, overall, she was "doing well."  (Tr. 508.) Examination findings were

normal.  (Tr. 509.)  Dr. Ritchey assessed high cholesterol, dysphagia, and fibromyalgia, which

she described as "stable/controlled."  (*Id*.)  She prescribed a statin for Seale's high cholesterol,

and referred her to a gastroenterologist for a consult regarding her Dysphagia.  (*Id*.)

On January 21, 2015, Seale presented to Angela Murphy, D.O.  (Tr. 531-536.)  She

reported she was "still trying to get disability" and "wondering if she should see a spine doctor

because her back is still bothering her."  (Tr. 532.)  Examination findings were normal.  (Tr.

533.)  Dr. Murphy assessed fibromyalgia and degenerative joint disease; referred Seale to

13

orthopedics; and renewed her handicap placard.  (Tr. 533.)

On April 3, 2015, Seale presented to orthopedist Jeffrey J. Roberts, M.D., for evaluation of her back and right leg pain.  (Tr. 519-521.)  Dr. Roberts recorded Seale's history and pain complaints as follows:

> She states she has lower back pain which is intermittently sharp and worse than 10 on a scale of 10.  This happens three times a week.  Sitting she has 7 on a scale of 10 pain. Standing and walking, she is able to do about a 1/2 block and then she states her right leg gives out.  She gets swelling over the anterior distal aspect of her right thigh,"like a big knot". She has pain in her right buttock and right anterior thigh. This pain occurs worse with walking. She states her whole body gets numb like a pins-and-needles sensation.  She is on Cymbalta and gabapentin. The gabapentin seems to be the only thing that helps with her fibromyalgia. She has filed for disability but has not been able to get disability.  She has an attorney working on that. I personally do not do disability but she certainly could see a physical medicine and rehabilitation doctor such as Dr. Shamir who may be able to help her work through that.  She has had significant weight gain on the gabapentin of 65 pounds. She tried Lyrica without relief.

(Tr. 519.)  On examination, Dr. Roberts noted Seale was "extremely anxious."  (Tr. 520.)  He found she was able to stand and walk with a normal gait, and able to stand on her toes and heels. (Tr. 521.)  Dr. Roberts noted diffuse tenderness about the midline thoracic and lumbar spines, worse in the lower lumbar area, but no muscle tenderness or spasms.  (*Id*.)  He found Seale was able to forward bend 30 degrees and extend 10 degrees, with pain.  (*Id*.)  Sitting straight leg raise test was negative bilaterally, but her "motor strength was notable with 3/5 strength for the right hip flexor, 4/5 for the left hip flexor, and quadriceps, hamstrings, ankle dorsi, and plantarflexors were 5/5."  (*Id*.)  Sensation was intact in both legs, and deep tendon reflexes were 4/4 for the quadricep bilaterally and 2/4 for the Achilles bilaterally.  (*Id*.)

Dr. Roberts noted that x-rays taken of Seale's lumbar spine that day showed mild lumbar scoliosis and very mild disc space narrowing at L5-S1.  (Tr. 521.)  He assessed lumbago and

14

degenerative disc lumbar.  (*Id.*) His recommendations were as follows:

> As she has already tried two courses of physical therapy without relief, I don't
> believe that another round of physical therapy would be of any benefit.  I don't
> see any indications for further MRI of the lumbar spine as she has had an MRI in
> 2010 and her symptoms are pretty much the same now as they were then.  She has
> no neurologic deficits to suggest a new MRI is needed.  The majority of her pain
> is very likely a combination of fibromyalgia and anxiety.  I have no further
> intervention for her.

(*Id.*)

## C.    State Agency Reports

On October 25, 2013, Seale underwent a consultative psychological examination with

Charles F. Misja, Ph.D.  (Tr. 446-452.)  She reported completing the 11th grade and then

attending a "special school for pregnant teens."  (Tr. 447.)  Seale indicated she married young

and "stayed with her [husband] for 19 years and the relationship was physically abusive for the

first couple years and then emotionally abusive."  (*Id.*)  She divorced her husband the previous

year, and lived with her parents and two children.  (*Id.*)

Seale reported a past medical history of fibromyalgia, degenerative arthritis of the spine,

sciatica, gastritis, a cyst on ovaries, and eczema.  (Tr. 448.)  Dr.  Misja noted she "walked to the

exam room with an unremarkable gait and without the use of any assistive devices."  (*Id.*) With

regard to her psychiatric history, Seale indicated she had been seeing a psychologist since

August 2013 and "plan[ned] to continue."  (*Id.*)  She noted "her lawyer recommended that she

consult a psychologist and her doctor also thought it would be a good idea."  (*Id.*)

Seale reported she had not driven since July due to her physical impairments.  (Tr. 449.)

She stated she "likes to go to amusement parks but must attend while in a wheelchair and can't

go on rides."  (*Id.*)  She was able to shower and brush her teeth, but reported difficulty dressing

herself and required her daughter's assistance to wash her hair and back.  (*Id*.)  Seale indicated she did not do any cleaning and goes grocery shopping twice per month.  (*Id*.)  She "does some laundry and some meal preparation but she gets lots of help in this regard because she can't open a jar or lift much."  (*Id*.)  Seale stated "I'm in pain all the time, especially when it rains."  (*Id*.)

On mental status examination, Seale was cooperative, made good eye contact, and did not appear to exaggerate symptoms.  (*Id*.)  Her speech was "unremarkable and free from pathology such as loose associations."  (*Id*.)  Seale's "affect was constricted and mood depressed and irritable and stable." (Tr. 450.)  She reported feeling "angry much of the time" and depressed, and admitted to feelings of hopelessness and guilt.  (*Id*.)  Seale reported no anxiety and Dr. Misja did not observe any outward signs of anxiety.  (*Id*.)  Seale did, however, report "great difficulty falling asleep and staying asleep" and indicated she was often awake for most of the night.  (*Id*.)  She also reported headaches and low energy.  (*Id*.)  Seale stated she "doesn't do exercise because 'it hurts too much,'" and that "she did physical therapy in the water but 'it didn't improve anything.'"  (*Id*.)

Dr. Misja concluded Seale was "probably functioning in the low average range of intelligence."  (Tr. 451.)  He diagnosed major depression and assessed a Global Assessment of Functioning ("GAF") of 50, indicating serious symptoms.[4]  (*Id*.)  With regard to the four

---

[4] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

functional areas, Dr. Misja found as follows:

> **Describe the claimants' abilities and limitations in understanding, remembering, and carrying out instructions.**
> The claimant dropped out of high school and never obtained her GED.  She is probably functioning in the low average range of intelligence and should be able to understand and implement ordinary instructions.
>
> **Describe the claimants' abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.**
> The claimant reported no history of problems with learning or attention and none were demonstrated during the brief intellectual screening and interview.  Problems in this area are likely to be in the minimal range.
>
> **Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**
> She denied a legal history and stated she has never been fired from a job.  She also stated that she's always gotten along well with supervisors.  At the current time she is experiencing considerable anger and this could spill over into the work environment.  Problems in this area are likely to be in the minimal to intermediate range.
>
> **Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**
> At two different jobs she worked for six years and reported no problems with attendance or ability to perform her tasks.  Problems in this area are likely to be in the minimal range.

(Tr. 452.)

On November 4, 2013, state agency physician Gary Hinzman, M.D., reviewed Seale's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 69-70.)  Dr. Hinzman found Seale could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of about 6 hours in an 8 hour workday; and sit for a total of about 6 hours in an 8 hour workday.  (*Id.*)  He further concluded Seale could frequently climb ramps/stairs, stoop, kneel, crouch and crawl; and occasionally climb ladders, ropes, and scaffolds.  (*Id.*)  Dr. Hinzman found Seale had unlimited push/pull capacity and no

17

manipulative limitations.  (*Id*.)

On November 8, 2013, state agency psychologist Jennifer Swain, Psy.D., reviewed
Seale's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 67-68.)
She concluded Seale had mild restrictions in her activities of daily living, social functioning and
in maintaining concentration, persistence, and pace.  (*Id*.)  Dr. Swain found as follows:

> [Seale] can understand, remember, and carry out simple and multi-step tasks
> commensurate with her intelligence level.  She can get along with others.  She
> would have minimal difficulty responding appropriately to work pressures.  Psych
> is not severe.

(Tr. 67.)

On December 26, 2013, state agency psychologist Vicki Warren, Ph.D., reviewed Seale's
medical records and completed a PRT Technique.  (Tr. 97-98.)  Dr. Warren reached the same
conclusions as Dr. Swain.  (*Id*.)

On January 7, 2014, state agency physician Edmond Gardner, M.D., reviewed Seale's
medical records and completed a Physical RFC Assessment.  (Tr. 100-101.)  He reached the
same conclusions as Dr. Hinzman, with the exception that he concluded Seale was also limited to
frequent overhead reaching on the right due to weakness and frequent bilateral
handling/fingering due to decreased grip strength and range of motion.  (*Id*.)

**D.**     **Hearing Testimony**

During the June 17, 2015 hearing, Seale testified to the following:

- She completed the eleventh grade.  (Tr. 43.)  She lives in a two story house with
  her parents and her children (ages 19 and 16).  (Tr. 40-41, 46.)  She has a
  driver's license but has not driven in two years because of stiffness in her leg
  and swelling in her knee.  (Tr. 42.)  She has a handicap tag for when she is
  driven places by other people.  (*Id*.)

- She has worked in the past as a janitor and a cleaner.  (Tr. 43, 53.)

18

- She can no longer work because of her back pain, which she rated an 8 on a scale of 10.  (Tr. 43.)  She described the pain as constant and excruciating.  (Tr. 44.)  She takes pain medication for this condition, which "takes the edge off" but does not completely relieve her pain.  (*Id*.)  Side effects from this medication include weight gain.  (*Id*.)  She has attended physical therapy twice in the past.  (*Id*.)  She does not use a TENS unit, has not had surgery, and no surgical procedures are planned.  (Tr. 45, 51.)  She has been to a pain specialist in the past, but she is no longer seeing him "because he can't do nothing for me nowhere." (Tr. 50.)

- She appeared at the hearing in a wheelchair.  (Tr. 40-41.)  She does not use it in her house, and only needs it for when she is going out for long periods of time.  (Tr. 41.)  She needs the wheelchair "because it hurts when I walk far."  (Tr. 45.)  The wheelchair was not prescribed by any of her doctors.  (Tr. 41, 51.)  She bought it on Facebook two weeks prior to the hearing.  (Tr. 41.)  She has never used a cane or crutches.  (Tr. 51-52.)

- She can walk 20 to 25 minutes before needing to sit down.  (Tr. 45.)  She can stand for 10 to 15 minutes.  (*Id*.)  She can sit for 20 to 25 minutes at one time.  (Tr. 46.)  She cannot bend, stoop, or squat.  (Tr. 45-46.)  She can pick up a coffee cup but not a gallon of milk.  (Tr. 46.)  She climbs stairs slowly.  (*Id*.)  She has no breathing problems and does not smoke.  (Tr. 47.)

- She has problems with her memory.  (Tr. 46.)  She can interact with strangers and has no problems with crowds of people.  (Tr. 47.)  She watches television and can follow a television program.  (*Id*.)  She sleeps one to two hours per day.  (Tr. 48.)  She sees her boyfriend every day, and visits with friends twice per week.  (Tr. 48-49.)  She has no hobbies.  (Tr. 49.)

- She requires her daughter's help to dress herself.  (Tr. 48.)  She does not cook and cannot do any household chores.  (*Id*.)  She goes shopping twice per week.  (Tr. 49.)  On a typical day, she lays in bed all day and watches movies.  (*Id*.)

The VE testified Seale had past work as a janitor (SVP 2, unskilled, light) and cleaner (SVP 2, unskilled, performed as heavy).  (Tr. 54-55.)  The ALJ then posed the following hypothetical question:

I'm going to ask you to assume an individual who is 36 years old, has eleventh grade education, can read and write simple English, perform simple arithmetic can – has a work background as a cleaner and janitor, as you testified.  This individual is limited to work of light exertional requirements, but has additional

19

> non-exertional limitations, specifically, no climbing of ladders, ropes, or
> scaffolds; occasional climbing of ramps and stairs, balancing, stooping,
> kneeling, and crouching; frequent handling, fingering, and overhead reaching;
> and mental limitation that she perform simple, routine tasks in a low-stressed
> environment, specifically, no fast-paced, strict quotas, or frequent duty changes
> involving superficial, interpersonal interactions, could she perform any of her
> past work?

(Tr. 55-56.)

The VE testified the hypothetical individual would be able to perform Seale's past work

as a janitor.  (Tr. 56.)  The VE further explained the hypothetical individual would also be able

to perform other representative jobs in the economy, such as inspection worker (SVP 2,

unskilled, light); counter clerk (SVP 2, unskilled, light), and packer (SVP 2, unskilled).  (Tr. 56-

57.)

The ALJ then asked a second hypothetical that was the same as the first but with the

additional limitation "that due to symptoms of medically determinable impairments, this

individual would be off task at least 20 percent of the time."  (Tr. 57.)  The VE testified there

would be no jobs for such a hypothetical individual.  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when

she became disabled; and (3) she filed while she was disabled or within twelve months of the

20

date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform,

21

the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Seale was insured on her alleged disability onset date, May 13, 2013, and remained insured through December 31, 2018, her date last insured ("DLI.")  (Tr. 18.)  Therefore, in order to be entitled to POD and DIB, Seale must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.    The claimant has not engaged in substantial gainful activity since May 13, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3.    The claimant has the following severe impairments: fibromyalgia, obesity, major depression, and degenerative changes of the spine (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 404.1545 and 416.945) to perform light work as defined in 20 CFR 404.1576(b) and 416.967(b), except for no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; frequent handling, fingering and overhead reaching; and mental limitation that she perform simple, routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions (20 CFR 404.1569a and 416.969a).

22

6.    The claimant is capable of performing past relevant work as a janitor. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    Additionally, while the claimant is capable of performing past relevant work, there are other jobs in the national economy that she is also able to perform.  Therefore, the Administrative Law Judge makes the following alternative findings for step five of the sequential evaluation process.

8.    The claimant has not been under a disability, as defined in the Social Security Act, from May 13, 2013, through the date of the decision (20 CFR 404.1520(f),(g), and 416.920(f),(g)).

(Tr. 18-29.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston*

23

*v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If

relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

***Credibility***

Seale argues the ALJ's credibility determination was not supported by substantial evidence because the ALJ "place[d] far too great [an] emphasis upon objective findings where the nature of the disorder, fibromyalgia, is subjective in nature and thus not amenable to such objective findings."  (Doc. No. 13 at 16.)  She maintains the ALJ failed to consider that her "hearing testimony was corroborated by treatment notes that contained consistent complaints of complications of her ability to engage in ADLs due to her fibromyalgia pain, as well as the requisite tender point findings."  (*Id*. at 17.)  Seale further argues the ALJ erred by "summarily dismissing" the third party statements submitted by family members that corroborate her subjective allegations.  (*Id*. at 17-18.)

The Commissioner argues substantial evidence supports the ALJ's credibility determination.  (Doc. No. 15 at 16.)  She asserts the ALJ "did not dismiss Plaintiff's allegations simply because the objective evidence did not support them."  (*Id*. at 18.)  Rather, the Commissioner asserts the ALJ considered the objective evidence as only one factor in his credibility determination, and also properly relied on Seale's inconsistent statements, discrepancies between Seale's pain allegations and her presentation, and treatment notes indicating Seale responded well to aquatic therapy and maintained a normal gait.  (*Id*.)  Finally,

25

the Commissioner argues the ALJ acknowledged the third party statements submitted by Seale's

family members and properly discounted them.  (*Id*. at 19-20.)

It is well settled that pain alone, if caused by a medical impairment, may be severe

enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs*., 667 F.2d 524,

538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983).  When

a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for

evaluating these symptoms.  *See e.g, Massey v. Comm'r of Soc. Sec*., 2011 WL 383254 at * 3 (6th

Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying medically

determinable physical or mental impairment that could reasonably be expected to produce a

claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the

claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the

claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 96–7p, 1996 WL

374186 (July 2, 1996).[5]  Essentially, the same test applies where the alleged symptom is pain, as

---

[5]  SSR 16-3p supercedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), which was in
effect at the time of the June 17, 2015 hearing.  This Court has previously decided, in
dicta, to apply SSR 16-3p retroactively.  *See e.g., Anderson v. Berryhill*, 2017 WL
1326437 at fn 3 (N.D. Ohio March 2, 2017).  Here, the Commissioner acknowledges in a
footnote that the agency recently replaced SSR 96-7p with SSR 16-3p, but neither party
fully addresses SSR 16-3p's application.  District courts within this Circuit have
disagreed regarding the retroactivity of SSR 16-3p and the Sixth Circuit has not
decided the issue. *See Sypolt v. Berryhill*, 2017 WL 1169706 at fn 4 (N.D. Ohio March 8,
2017) *(*applying SSR 16-3p retroactively); *Clayton v. Comm'r of Soc. Sec*., 2016 WL
5402963 at * 6 (E.D. Mich. Sept. 28, 2016) (applying SSR 16-3p but not directly
addressing issue of retroactivity); *Carpenter v. Comm'r of Soc. Sec*., 2017 WL 1038913
at * 11 (N.D. Ohio March 17, 2017) (applying SSR 16-3p but not directly addressing
issue of retroactivity).  *But see Murphy v. Comm'r of Soc. Sec*., 2016 WL 2901746, at n.
6(E.D. Tenn. May 18, 2016) (declining to apply SSR 16-3p retroactively); *Withrow v.
Comm'r of Soc. Sec*., 2016 WL 4361175 at fn 5 (S.D. Ohio Aug. 16, 2016) (same);
*Richards v. Comm'r of Soc. Sec.*, 2017 WL 892345 at fn 5 (E.D. Mich. Feb. 16, 2017);
*Davis v. Astrue*, 2016 WL 5957616 at fn 2 (W.D. Tenn. Oct. 14, 2016) (same); *Baker v.*

the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 834 (6th Cir. June 23, 2005).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case

---

*Comm'r of Soc. Sec.*, 2016 WL 4361174 at fn 2 (S.D. Ohio Aug. 16, 2016); *Scott v. Berryhill*, 2017 WL 875480 at fn 7 (E.D. Ky. March 3, 2017). The Sixth Circuit, while declining to reach the retroactivity issue, has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.' " *Dooley v. Comm'r of Soc. Sec.*, 656 Fed. Appx. 113, 119 n.1 (6th Cir. 2016). Here, Seale makes no argument that applying SSR 16-3p over SSR 96-7p would change the outcome. As discussed above, the ALJ evaluated Seale's complaints against the medical record and did not judge her character. In any event, the Court's evaluation of Seale's credibility argument herein would be the same applying either SSR 16-3p or SSR 96-7p.

record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96–7p, Purpose Section, 1996 WL 374186 (July 2, 1996); *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").[6]

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. §404.1529; SSR 96–7p, Purpose, 1996 WL 374186 (July 2, 1996). Beyond medical evidence, there are seven factors that the ALJ should consider.[7]  The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ determined, at step two, that Seale suffered from the severe impairments of fibromyalgia, obesity, major depression, and degenerative changes of the spine.  (Tr. 20.)

---

[6] SSR 16-3p similarly provides that an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029 at *9.

[7] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 96–7p, Introduction and SSR 16-3p, 2016 WL 1119029 at * 7; *see also Cross v. Comm'r of Soc. Sec*., 373 F.Supp.2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

28

After determining at step three that Seale's impairments did not meet or equal a Listing, the ALJ

continued at step four to consider Seale's self-reported limitations, as well as the objective

medical evidence regarding her fibromyalgia and back pain.  (Tr. 21-24.)  Specifically, the ALJ

acknowledged medical evidence regarding Seale's pain and weakness resulting from these

conditions as follows:

> The claimant has a history of fibromyalgia (Ex. 3F/5).  In November 2012, Joseph
> Abdelmalak, M.D., found that the claimant had neuropathic pain and intercostal
> neuralgia (Ex. 3F/5).  Subsequently, the claimant had a left intercostal nerve
> block under ultrasound guidance (Ex. 3F/9).  However, in February 2013, she
> presented with musculoskeletal tenderness (Ex. 3F/ 19).  She was found to have
> tenderness over the supraclavicular and infraclavicular area, tenderness over the
> trapezius muscles bilaterally, and tenderness over the thoracic and lumbar
> paraspinal muscles (Ex. 3F/19).  Dr. Abdelmalak diagnosed the claimant with
> fibromyalgia as well as myalgia and myositis (Ex. 3F/19).  The claimant
> subsequently underwent trigger point injections (Ex. 3F/20).  In May 2013, the
> claimant was found to have pain located in the neck, and pain in the right lower
> and upper extremity that radiated to the right lower extremity (Ex. 3F/23).  She
> was also found to have pain with range of motion of the right knee (Ex. 3F/25).
> In June 2013, she was noted for right shoulder pain, and tenderness in the right
> elbow and right wrist (Ex. 3F/31).  She was found to have an antalgic gait that
> favored the left leg (Ex. 3F/31).  In July 2013, she was noted for being positive
> for tenderness of all 18 points (Ex. 9F/8; 13).  In November 2013, the claimant
> was found to have joint pain, joint swelling of the right knee, and fatigue (Ex.
> 14F/1).  In January 2014, the claimant was assessed to have right arm weakness
> and right leg weakness by Angela Ritchey, D.O. (Ex. 11F/3).  In March 2014, she
> was noted for having diffuse muscle pain (Ex. 12F/9).

> The claimant also has a history of back pain (Ex. 3F/4).  An MRI of the claimant's
> lumbar and thoracic spine revealed mild degenerative disc disease at T3 to T4 and
> L5 to Sl (Ex. 3F/5).  She had hypersensitivity to touch over the left mid thoracic
> area (Ex. 3F/5).  The claimant was again noted for pain in her thoracic and lumbar
> spine in February 2013 (Ex. 3F/19).  In June 2013, the claimant's straight leg
> raising caused pain in the right quadricep muscle (Ex. 3F/31).  In January 2014,
> the claimant presented with complaints of pulling a muscle while dressing (Ex.
> 11F/6).  She reported pain in her left lower back and buttocks (Ex. 11F/6).  Dr.
> Ritchey diagnosed the claimant with sciatica (Ex. 11 F/7).  The claimant
> presented in April 2015 with complaints of mid back pain.  The claimant had an
> x-ray of her lumbar spine (Ex. 15F/3).  Jeffrey Roberts, M.D., found that the
> claimant had mild lumbar scoliosis and very mild disc space narrowing at L5-Sl

(Ex. 15F/3).

(Tr. 24.)

The ALJ then found Seale's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible" for several reasons.  (Tr. 24-25.)  The ALJ explained as follows:

> The claimant has made inconsistent statements, which tend to undermine her credibility.  The claimant reported in her Function Report that she was prescribed a wheelchair in July 2013; however, at the hearing she acknowledged that her wheelchair was not prescribed (Ex. 2E/9).  Moreover, the medical evidence does not support the claimant requiring the use of an ambulatory aid, such as a cane, crutches or a wheelchair.  Specifically, the claimant was noted for having a normal gait without the use of an assistive device (Ex. 14F/ 11).  She was also noted for having normal lower extremity strength bilaterally (Ex. 11F/7, 12).  The claimant's appearance at the hearing in a wheelchair, which is medically unnecessary, adversely affects her credibility.
>
> In regards to the claimant's fibromyalgia, the undersigned finds that the objective medical evidence shows that the claimant is not as limited as she suggests.  The claimant alleged that she has difficulty with lifting, reaching, sitting, walking, and standing (Ex. 2E/8).  However, the claimant had physical and aquatic therapy with good results supported.  In June 2013, the claimant was noted for her "toe and heel walk" test resulting in shooting pain (Ex. 7F/ 19).  By November 2013, her toe and heel walking test was normal (Ex. 8F/8).  Likewise, her toe and heel walk remained normal at her May 2014 and April 2015 examinations (Ex. 14F/3, 11).  She was further noted for being able to perform all of her exercises without pain production (Ex. 7F/ 11).  She had improved postural awareness (Ex. 7F/8).  She was also noted for being able to decrease pain and symptoms with extension in standing (Ex. 7F/8).  Moreover, she acknowledged feeling good when doing aquatics (Ex. 9F/8).  Additionally, the claimant was noted for no instability in her upper and lower extremity joints (Ex. 14F/ 11).  She could stand and walk with a normal gait (Ex. 15F/3).
>
> Concerning the claimant's back impairment, the undersigned finds that the claimant is not limited to the degree she has alleged.  The degenerative disc disease at T3 to T4 and LS to Sl was mild (Ex. 3F/5).  Moreover, the claimant had conservative treatment with good results supported.  In June 2013, the claimant's straight leg raising caused pain in the right quadricep muscle (Ex. 3F/31).  By

30

April 2015, her straight leg raise test was negative bilaterally (Ex. 15F/3).
Furthermore, Dr. Roberts noted that the claimant had very mild disc space
narrowing at L5-Sl (Ex. 15F/3).  There was no evidence of disc herniation or
nerve root impingement (Ex. 15F/3).  In May 2014, she was found to have no
percussion tenderness of the thoracic or lumbar spine, and in April 2015, she was
noted for having no paraspinal muscle tenderness (Exs. 14F/ 11; 15F/3).

(Tr. 25.)

Seale argues the ALJ's credibility analysis was flawed because the ALJ failed to
properly analyze her fibromyalgia.  She notes that fibromyalgia is "subjective in nature" and
emphasizes that patients with this condition often present with no objectively alarming signs.
(Doc. No. 13 at 15-17.)  Because the ALJ "over-emphasized" the lack of objective proof, Seale
maintains the ALJ failed to properly evaluate her fibromyalgia consistent with SSR 12-2p,
necessitating a remand.

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching
and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244,
n.3 (6th Cir. 2007) (quoting Stedman's Medical Dictionary for the Health Professions and
Nursing at 541 (5th ed. 2005)).  *See also* SSR 12–2p, 2012 WL 3104869 at *2 (describing
fibromyalgia as "a complex medical condition characterized primarily by widespread pain in
the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months.").
CT scans, x-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia]
or its severity." *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988*).
Moreover, "physical examinations will usually yield normal results—a full range of motion, no
joint swelling, as well as normal muscle strength and neurological reactions. There are no
objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by
exclusion." *Preston*, 854 F.2d at 818.  *See also Rogers*, 486 F.3d at 244.  However, the mere

diagnosis of the condition "does not automatically entitle [a claimant] to disability benefits....

Some people may have a severe case of fibromyalgia as to be totally disabled from working but

most do not and the question is whether claimant is one of the minority."  *Vance v. Comm'r of

Soc. Sec*., 260 Fed. Appx 801, 806 (6th Cir. 2008).

In July 2012, the SSA released SSR 12-2p, which "provides guidance on how we

develop evidence to establish that a person has a medically determinable impairment of

fibromyalgia, and how we evaluate fibromyalgia in disability claims ...."  SSR 12-2p, 2012 WL

3104869, at *1 (July 25, 2012).  To that end, SSR 12-2p describes criteria for establishing that a

person has a medically determinable impairment of fibromyalgia, the sources of evidence the

ALJ may look to, and how a claimant's subjective assertions of pain and functional limitations

are evaluated.  *Id.  See also Luukkonen v. Comm'r of Soc. Sec*., 2016 WL 3426370 at * 4 (6th

Cir. June 22, 2016).  The Ruling emphasizes that fibromyalgia should be analyzed under the

traditional five-step evaluation process used for analyzing other disability claims.  *See* SSR 12-

2p at *5–6.  Importantly, SSR 12-2p "is merely a binding interpretation of that which was

already lawfully in effect."  *Luukkonen*, 2016 WL 3426370 at * 4.  "In other words, SSR 12-2p

merely provides guidance on how to apply pre-existing rules when faced with a claimant

asserting disability based on fibromyalgia."  *Id.*

The Court finds the ALJ's credibility analysis is supported by substantial evidence.  As

the Commissioner correctly notes, the ALJ provided several reasons for discounting Seale's

claims of disabling pain.  First, the ALJ found Seale's credibility was undermined by the fact

that she appeared at the hearing in a wheelchair, despite the fact it had not been prescribed by a

physician and the medical record indicated she did not require an ambulatory assistive device.

32

(Tr. 25.)  This reason is supported by substantial evidence.  At the hearing, Seale acknowledged her wheelchair was not prescribed by any of her doctors and that, in fact, she had bought it on Facebook two weeks before the hearing.  (Tr. 41, 51-52.)  She also acknowledged she had never used or been prescribed a cane or crutches.  (Tr. 51-52.)

Moreover, Seale does not direct this Court's attention to any evidence in the record suggesting her physicians prescribed an ambulatory assistive device or otherwise suggested she use one.  To the contrary, substantial evidence supports the ALJ's conclusion that "the medical evidence does not support the claimant requiring the use of an ambulatory aid, such as a cane, crutches, or a wheelchair."  (Tr. 25.)  Specifically, in September 2013, November 2013 and May 2014, Dr. Tsai found Seale "ambulates well without assistance or assistive devices" and her gait was "normal without assistive devices."  (Tr. 416-417, 488-489, 496-497.)  Further, in April 2015, Dr. Roberts found Seale was able to stand and walk with a normal gait, and able to stand on her toes and heels.  (Tr. 521.)  Seale does not direct this Court's attention to any authority suggesting the ALJ erred in relying on this evidence as part of his credibility analysis.

The ALJ also found "the objective medical evidence shows that the claimant is not as limited as she suggests."  (Tr. 25.)  As noted above, Seale strongly objects to this finding, arguing it shows the ALJ inappropriately relied on "objective medical evidence" in discounting the severity of her fibromyalgia symptoms.  The Court disagrees.  While the ALJ references the "objective evidence" in his credibility analysis of Seale's fibromyalgia, a close reading of the decision reveals the ALJ relied primarily on treatment records indicating Seale improved with aquatic therapy, was able to perform exercises without pain production, and showed improvement in her ability to engage in toe to heel walking.  The Court finds it was reasonable

33

for the ALJ to rely on evidence of improvement with treatment and, further, that this reason is supported by substantial evidence in the record.

As the ALJ correctly noted, Seale participated in aquatic therapy from June through August 2013, and consistently reported that therapy decreased her pain.  Specifically, on June 14, 2013, the physical therapist noted Seale "responded well to the pool, pt reported decreased pain."  (Tr. 404.)  The therapist further indicated that, after treatment, Seale rated her pain a 4 out of 10 (down from an 8 out of 10 at the beginning of the session) and reported "no more shooting pain anywhere, 'the water made my arms feel better.'"  (*Id*.)  On June 24, 2013, Seale again reported decreased pain after engaging in aquatic therapy.  (Tr. 402.)  On July 8, 2013, the therapist noted Seale was "able to perform all exercises today without pain production."  (Tr. 400.)  At that visit, the therapist described Seale's functional gains as improved postural awareness, improved quality of movement, increased endurance/activity tolerance, improved independence with home exercise plan, and decreased intensity of pain.  (*Id*.)  On July 15, 2013, therapist James Badowski stated Seale was "without demonstration of pain behavior before, during or after [physical therapy] session," noting she smiled and laughed despite reporting 10+/10 pain.  (Tr. 396, 398.)  Seale showed the same functional gains as in her previous visit.  (*Id*.)  On July 29, 2013, Seale "stated she was in the pool 3 times last week, so she feels good today."[8]  (Tr. 393.)

_____

[8]  Although Seale reported worsening symptoms on August 27, 2013, therapist Badowski found she was "not consistent with [home exercise plan], and does not demonstrate typical pain behaviors," indicating she "smiles frequently throughout session . . ., transfers easily . . .[, and] also provides limited force production during manual muscle testing."  (Tr. 392-393.)  As a result, Mr. Badowski found Seale was "not appropriate for skilled physical therapy" and recommended pain management.  (Tr. 393.)

34

The ALJ also correctly noted Seale reported improvement with regard to her "toe and heel walking." (Tr. 25.)  During her initial physical therapy session on June 12, 2013, examination revealed Seale was able to toe and heel walk, but it "result[ed] in shooting pain up R side of back." (Tr. 406.)  This treatment note also indicated Seale had an antalgic gait. (*Id.*) In both November 2013 and May 2014, however, Seale had normal toe and heel walk and normal gait, and could ambulate well without assistance. (Tr. 487-488, 496-497.)  Similarly, in April 2015, Seale was able to stand and walk with a normal gait and "stand on her toes and heels." (Tr. 521.)  Seale has not demonstrated the ALJ erred in relying on this evidence of improvement in assessing her credibility, nor has she established the ALJ's findings on this issue are unsupported by substantial evidence.

Finally, the ALJ discounted Seale's credibility on the grounds that the objective medical evidence regarding her back condition did not establish she was "limited to the degree she has alleged." (Tr. 25.)  The Court finds this reason is also supported by substantial evidence.  As the ALJ noted, the July 2010 MRI of Seale's lumbar/thoracic spine showed only mild degenerative disc disease with no significant canal or foraminal stenosis. (Tr. 340.) Moreover, lumbar x-rays taken in April 2015 showed only mild lumbar scoliosis with "very mild disc space narrowing at L5-S1." (Tr. 521.)  The Court finds the ALJ did not err in relying on this objective medical evidence in the context of evaluating the credibility of Seale's pain complaints stemming from her back impairment.

Seale next argues the ALJ erred in "summarily dismissing" the third-party statements submitted by Seale's family members. (Doc. No. 13 at 17-18.)  The record reflects Seale submitted statements from her parents, daughter, son, and boyfriend, each of whom discussed

Seale's physical symptoms and how those symptoms impacted her abilities to conduct activities

of daily living.  (Tr. 265-268.)  Seale's parents' statement is representative and provides as

follows:

> I Debbie Crawford and Larry Crawford are the parents of Theresa (Terry) Seale.
>
> Terry Seale and her family live with us.  I have seen her go through pain and agony.  There are times when I have to brush her hair if her family are not around, as she can't get her arms high enough to do so or not enough strength to get the knots out.  She will do dishes but only about 10 items and then-has to go sit down because of her back pain, can't sit or stand long periods of time and after dishes her hands will swell.  She can only lift about 5 lbs.  Her knee also gives out when walking too much.  Tried different medications, not working.
>
> When she does things like house work, doing laundry and folding clothes she['s] done for the rest of the day with her back and hands.
>
> Her father, Larry Crawford, has to take her to all of her doctor's appointments as she can't drive; when she does her knee swells up and that's just backing the car into the street.
>
> With her back issues not being able to sit or stand long periods of time, fibromyalgia and arthritis is her knee, arms and hands, I don't know what kind of job she can do.

(Tr. 265.)  The ALJ acknowledged the third party statements submitted on Seale's behalf but

rejected them as follows:

> The undersigned has also considered but rejects the layperson opinions submitted by the claimant's parents, daughter, son and boyfriend in accordance with SSR 06-03p, as these opinions are discrepant with the objective medical evidence and clinical findings of record, and represent layperson statements made by individuals who are biased in the claimant's favor (Exs. 8E, 9E, 10E, 11E).

(Tr. 27.)

Information from "other sources," such as family members, may assist the

Commissioner in determining the severity of a medically determinable impairment.  *See* SSR

06–03P, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006).  Information submitted by a non-

36

medical source who has seen the claimant in a nonprofessional capacity, such as a family member, may be considered in light of "such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." *Id.* at *6.  The ALJ should consider the evidence submitted by other sources and should explain the weight given to their opinions when their opinions may affect the case outcome. *Id.  See also Spillers v. Colvin*, 2016 WL 867635 at * 11 (M.D. Tenn. Jan. 29, 2016).  However, there is no requirement that the ALJ discuss the statements in great detail or offer good reasons for rejecting them.  *See e.g., Walsh v. Colvin*, 2016 WL 1752854 at * 18-19 (N.D. Ohio May 3, 2016); *Webb v. Comm'r of Soc. Sec.*, 2016 WL 791453 at * 10 (N.D. Ohio Jan. 26, 2016); *Kidd v. Colvin*, 2014 WL 7238347 at * 7 (N.D. Ohio Dec. 17, 2014).

The Court finds the ALJ did not err in his treatment of the third party statements submitted by Seale's parents, children, and boyfriend.  While he did not discuss the statements at length, the ALJ considered each of the statements and rejected them on the grounds they were (1) "discrepant with the objective medical evidence and clinical findings of record," and (2) "represent layperson statements made by individuals who are biased in the claimant's favor." (Tr. 27.)  Reading the decision as a whole, and considering the ALJ's assessment of Seale's treatment records and the opinion evidence, the Court finds the ALJ's explanation is sufficient to satisfy the regulations.  *See e.g., Spillers,* 2016 WL 867635 at * 11;  *Walsh*, 2016 WL 1752854 at * 18-19; *Webb*, 2016 WL 791453 at * 10; *Kidd*, 2014 WL 7238347 at * 7.

Furthermore, even if the ALJ's assessment of the third party opinions was erroneous, the error would be harmless, as Seale has failed to identify how the outcome of her case would be different if the ALJ had assigned great weight to the third party statements.  Specifically,

Seale has not identified any specific restrictions that she believes should have been included in the RFC based on the third party statements at issue.  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."  *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005 ) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)).  *See also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004 ) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766, n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) ).  Accordingly, the Court finds the ALJ did not err in his consideration of the third party statements.

Therefore, and for all the reasons set forth above, the Court finds the ALJ's credibility analysis is supported by substantial evidence.

### Treating Physician Dr. Bhatia

Seale next argues the ALJ failed to give "good reasons" for discounting the opinion of Dr. Bhatia.  (Doc. No. 13 at 12.)  She maintains the ALJ "makes no effort to examine any of the regulatory factors for assessing opinion evidence from a treating source, and thereby errs."  (*Id*.)  Seale further asserts the reasons articulated by the ALJ for rejecting Dr. Bhatia's opinion are not supported by substantial evidence.  (*Id*. at 13.)  Finally, Seale argues "the ALJ failed to consider perhaps the most salient factor in this case: Dr. Bhatia appears at the intersection of all of Plaintiff's treatment in this case, receiving reports from rheumatologists and others regarding her care."  (*Id*. at 14.)  Thus, Seale argues "Dr. Bhatia occupied the unique position among her treating sources as the source receiving the most information, and thus placing her in the best

38

position to determine Plaintiff's functional limitations and update them accordingly, should she determine it necessary to do so."  (*Id.*)

The Commissioner argues the ALJ reasonably determined that Dr. Bhatia's opinion was entitled to only "limited weight."  (Doc. No. 15 at 11.)  She argues the ALJ articulated several "good reasons" for discounting this opinion, including that (1) none of Seale's other physicians reported findings consistent with Dr. Bhatia's assessment; and (2) Dr. Bhatia's opinion was inconsistent with her own findings.  The Commissioner asserts these reasons are supported by substantial evidence and, further, that the ALJ's RFC determination is supported by the opinions from state agency physicians Drs. Hinzman and Gardner.  (*Id*. at 13.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight." *Id*.  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.*  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Soc. Sec. Rul. No. 96–6p, 1996 WL

374180, at *2 (Soc. Sec. Admin. July 2, 1996).

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart,* 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).[9]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[10]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight,

---

[9] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[10] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

40

"the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.[11]

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581

---

[11]  "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  20 C.F.R. § 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion.  *Id.* § 404.1527(c)(6)."  *Gayheart*, 710 F.3d at 376.

41

F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan*., 801 F.2d at 855; *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id.*  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

As discussed *supra*, Seale began treatment with primary care physician Dr. Bhatia on June 13, 2013.  (Tr. 373-378.)  On that same date, Dr. Bhatia completed a "Medical Source Document" regarding Seale's Physical Capacity.  (Tr. 380.)  Dr. Bhatia opined Seale could (1) sit for less than 2 hours in an 8 hour workday; (2) stand/walk for less than 2 hours in an 8 hour workday; (3) occasionally lift and carry less than 5 pounds; and (4) walk for less than one city block without rest or severe pain.  (*Id.*)  Dr. Bhatia found Seale was restricted in her abilities to bend forward, walk, and change positions.  (*Id.*)  She concluded Seale's pain or other symptoms would frequently interfere with her attention, concentration, persistence and pace.  (*Id.*)  Dr. Bhatia indicated emotional factors contributed to the severity of Seale's symptoms and functional limitations, and found Seale was moderately limited in her ability to deal with work stress.  (*Id.*)  She concluded Seale would be absent from work more than three times a month as

a result of her impairments, and that "the cumulative effects of all [Seale's] medical problems,

psychological problems and symptoms [would] allow her to work" zero hours per day.  (*Id.*)

Dr. Bhatia found Seale's prognosis for marked improvement or complete recovery was "fair,"

and her prognosis for ability to return to work was "not good."  (*Id.*)  Finally, Dr. Bhatia

indicated Seale's impairments lasted or could be expected to last at least twelve months and,

further, that she was likely to experience more medical problems that would increase her

limitations.  (*Id.*)

> The ALJ weighed Dr. Bhatia's opinion as follows:
>
> The undersigned gives limited weight to the "checklist" opinion of Mudita Bhatia, M.D.  (Ex. 5F/2).  He opined that the claimant can work 0 hours per day and would be absent more than 3 times a month.  He further opined that the claimant can sit, stand, and walk for less than 2 hours out of an 8 hour workday (Ex. 5F/2).  The undersigned notes that the claimant has consulted with at least six physicians regarding fibromyalgia, none of whom reported findings that would support the claimant's allegations of disabling limitation of function.  Furthermore, Dr. Bhatia's opinion is unsupported by his own findings and the findings submitted by the other physicians of record.  Specifically, the claimant was noted for no instability in her upper and lower extremity joints (Ex. 14F/ 11).  She was noted for being able to engage in her exercises without pain production (Ex. 7F/ 11).  Accordingly, the opinion of Dr. Bhatia is given limited weight.

(Tr. 26.)

As an initial matter, the Court is not convinced that Dr. Bhatia was Seale's treating

physician at the time she rendered her opinion.  The record reflects Dr. Bhatia had only

examined Seale on one occasion when she authored her opinion regarding Seale's physical

functional limitations.[12]  A treating source is an acceptable medical source who provides, or has

provided, a claimant with medical treatment or evaluation and who has had an ongoing

---

[12]   Moreover, the ALJ does not expressly identify Dr. Bhatia as a treating source in the decision.  (Tr. 26.)

treatment relationship with the claimant.  *See Sims v. Comm'r of Soc. Sec.*, 2016 WL 866677 at

* 7 (N.D. Ohio March 7, 2016) (citing 20 CFR § 404.1502).  The Commissioner will generally

consider there to be an "ongoing treatment relationship" when the medical evidence establishes

that a claimant is or has been seen with a frequency consistent with accepted medical practice

for the type of treatment or evaluation required for a claimant's medical condition.  *Id*.  "The

treating physician doctrine is based on the assumption that a medical professional who has dealt

with a claimant and his maladies over a long period of time will have a deeper insight into the

medical condition of the claimant than will a person who has examined a claimant but once [.]"

*Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 507 (6th Cir. 2006) (quoting *Barker v.

Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)).

The plaintiff has the burden of showing that a doctor is a treating physician.  *Sims*,

2016 WL 866677 at * 7.  Before determining whether the ALJ complied with the treating

physician rule, the court first determines whether the source is a treating source.  *Cole v. Astrue*,

661 F.3d 931, 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876

(6th Cir. 2007)).  Here, as noted above, Dr. Bhatia had seen Seale only once when she rendered

her June 2013 opinion.  In *Kornecky*, the Sixth Circuit explained that a single visit is generally

not sufficient to establish a treating relationship:

> Kornecky cites no authority where a federal court has found a source to be a
> treating source after only one visit.  However, a plethora of decisions
> unanimously hold that a single visit does not constitute an ongoing treatment
> relationship.  *See, e.g., White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005)
> (occupational medicine specialist who evaluated claimant only once was not a
> treating physician).  Indeed, depending on the circumstances and the nature of the
> alleged condition, two or three visits often will not suffice for an ongoing
> treatment relationship.  *See, e.g., Cunningham v. Shalala*, 880 F.Supp. 537, 551
> (N.D.Ill.1995) (where physician saw claimant five times in two years, it was
> "hardly a foregone conclusion" that his opinion should be afforded great weight).

44

*Id*. at 506-507.  *See also Rishel v. Colvin,* 2015 WL 1538445 at fn 5 (N.D. Ohio April 7, 2015)

("[I]t appears Rishel only saw each physician once and one visit does not establish a treating

relationship"); *Witnik v. Colvin,* 2015 WL 691329 at * 5 (N.D. Ohio Feb. 18, 2015) ("One visit

does not establish a treating relationship"); *Hickman v. Colvin*, 2014 WL 2765670 at * 12 (M.D.

Tenn. June 18, 2014) (noting that "[p]recedent in this Circuit suggests that a physician who

treats an individual only twice or three times does not constitute a treating source."); *Daniels v.

Comm'r of Soc. Sec*., 152 Fed App'x 485, 491 (6th Cir. 2005).  *See also Wright v. Colvin*, 2016

WL 5661595 at * 7 (N.D. Ohio Sept. 30, 2016); *Farley v. Colvin*, 2016 WL 4543113 at * 8

(N.D. Ohio Aug. 31, 2016); *Cockrell v. Comm'r of Soc. Sec*., 2016 WL 455633 at * 6 (N.D.

Ohio Feb. 5, 2016).

　　　　Seale does not point to any special circumstances surrounding her treatment

relationship with Dr. Bhatia that would establish her as a treating source for purposes of

analyzing the opinion she rendered after one visit.  *See Cockrell*, 2016 WL 455633 at * 6;

*Beauchamp v. Comm'r of Soc. Sec*., 2014 WL 1154117 at * 10-11 (N.D. Ohio March 21, 2014).

Moreover, while the record reflects Seale did visit Dr. Bhatia on two occasions after she

authored the June 2013 opinion, "subsequent visits to [a physician] are irrelevant in determining

whether the [an] opinion was that of a treating physician *when it was completed*."  *Witnik*, 2015

WL 691329 at *5 (emphasis added).  "The question is whether [the claimant] had the ongoing

relationship with [the physician] to qualify as a treating physician *at the time he rendered his

opinion*."  *Kornecky*, 167 Fed. Appx. at 506 (emphasis added) (noting that visits to a physician

after an assessment had been made "could not retroactively render [the doctor] a treating

physician at the time of the assessment.")  Accordingly, the Court has considerable doubt that

Dr. Bhatia constituted Seale's treating physician at the time she authored her opinion. However, as the Commissioner does not raise this issue in her Brief, the Court will nonetheless assume Dr. Bhatia constituted a "treating physician" for purposes of this Report & Recommendation.

Upon review, and reading the decision as a whole, the Court finds the ALJ articulated "good reasons" for assigning only "limited weight" to Dr. Bhatia's opinion.  The ALJ discounted Dr. Bhatia's opinion, in part, because it was not supported by the findings of Seale's other physicians and treatment providers.  (Tr. 26.)  This reason is supported by substantial evidence.  As the ALJ discussed earlier in the decision, treatment records reveal that Seale consistently reported improvement with aquatic therapy and was able to perform exercises without pain production.  Specifically, while Seale presented to Dr. Bhatia in June 2013 with significant symptoms including a limping gait and painful range of motion, Seale thereafter underwent several months of aquatic therapy during which she reported the ability to perform all exercises without pain production, as well as improved quality of movement, increased endurance/activity tolerance, and decreased pain.  (Tr. 404, 402, 400, 398.)  In September and November 2013 and May 2014, Seale's rheumatologist, Dr. Tsai, noted Seale had full range of motion, normal gait, intact sensation, full motor strength, and normal muscle tone.  (Tr. 416-417, 488-489, 497.)  In July 2014, Seale reported to Dr. Ritchey that she was "overall doing well."  (Tr. 508.)  Examination findings were normal and Dr. Ritchey described Seale's fibromyalgia as "stable/controlled."  (Tr. 509.)  Examination findings were again normal during a visit with Dr. Murphy in January 2015.  (Tr. 533.)

Moreover, as the Commissioner correctly notes, Dr. Bhatia's opinion is contradicted

46

by the opinions of state agency physicians Dr. Hinzman and Dr. Gardner, both of whom

concluded Seale could perform a reduced range of light work.  (Tr. 69-70, 100-101.)  The ALJ

accorded "partial weight" to Dr. Hinzman's and Dr. Gardner's opinions, noting "the objective

medical evidence supports these opinions; however, extending maximum credibility to the

claimant's allegations and considering the combined effectg of her impairments, the

undersigned finds a more restrictive physical residual functional capacity[13] than Dr. Hinzman

and Dr. Gardner."[14]  (Tr. 27.)  Seale does not direct this Court's attention to any other treating

or examining physician opinion that is consistent with Dr. Bhatia's opinion or otherwise

suggests that additional restrictions should have been included in the RFC.

Seale nonetheless argues remand is required because "the ALJ makes no effort to

examine any of the regulatory factors."[15]  (Doc. No. 13 at 12.)  This argument is without merit.

---

[13] The RFC limited Seale to "light work as defined in 20 CFR 404.1576(b) and
416.967(b), except for no climbing of ladders, ropes, or scaffolds; occasional climbing of
ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; frequent
handling, fingering and overhead reaching; and mental limitation that she perform
simple, routine tasks in a low stress environment (no fast pace, strict quotas or frequent
duty changes) involving superficial interpersonal interactions."  (Tr. 23.)

[14] Seale argues, in a footnote, that the ALJ erred because Dr. Gardner's opinion
contained "limited" limitations in right overhead reaching and bilateral handling and
fingering, while the RFC only restricted her to "frequent" performance of each.  (Doc.
No. 13 at fn 1.)  This argument is rejected.  In the explanation portion of his opinion, Dr.
Gardner specifically limited Seale to "freq overhead reach on right due to weakness; freq
bilateral handling/fingering due to decreased grip strength and [range of motion.]" (Tr.
101.)  Consistent with this opinionThe RFC expressly includes a limitation to "frequent
handling, fingering and overhead reaching."  (Tr. 23.)

[15] These factors include i.e., the length of the relationship and frequency of examination,
the nature and extent of the treatment relationship, how well-supported the opinion is by
medical signs and laboratory findings, its consistency with the record as a whole, the
treating source's specialization, the source's familiarity with the Social Security program
and understanding of its evidentiary requirements, and the extent to which the source is
familiar with other information in the case record relevant to the decision..  See 20 C.F.R.

While the ALJ did not explicitly cite the regulatory factors set forth in 20 CFR § 404.1527, the ALJ did, in fact, rely on several of these factors in discounting Dr. Bhatia's opinion. Specifically, the ALJ explained Dr. Bhatia's opinion was entitled to only "limited weight" because it was not supported by the findings of Seale's other physicians and treatment providers.  (Tr. 26.)  The ALJ also found Dr. Bhatia's opinion was not consistent with treatment records showing she had no instability in her extremity joints, and was able to engage in her exercises without pain production.  (*Id.*)  Thus, the Court finds that, even though the ALJ did not explicitly cite the regulatory factors, it is clear he considered the supportability and consistency of Dr. Bhatia's opinion as required by 20 C.F.R. § 404.1527.  Because the ALJ decision is "sufficiently specific to make clear the weight given to the opinion and the reasons for that weight," remand is not required.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804-805 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include "good reasons ... for the weight ... give[n] [to the] treating source's opinion"—not an exhaustive factor-by-factor analysis.  *Id.* § 404.1527(d)(2). . . . In assigning no weight to [the claimant's treating physician] opinion, the ALJ cited the opinion's inconsistency with the objective medical evidence, Francis's conservative treatment and daily activities, and the assessments of Francis's other physicians. Procedurally, the regulations require no more."); *Infantado v. Astrue*, 263 Fed. Appx. 469, 474 (6th Cir. 2008) (where the ALJ did, in fact, rely on regulatory factors in discounting treating physician opinion, "the ALJ's failure to explicitly cite the regulation factors is no impediment to meaningful review and is therefore not grounds for reversal."); *Aiello-Zak*

---

§ 404.1527(c)(2).

48

*v. Comm'r of Soc. Sec.*, 47 F.Supp.3d 550, 558 (N.D. Ohio 2014); *Kutsick v. Comm'r of Soc. Sec.*, 2017 WL 413995 at * 3-4 (N.D. Ohio Jan. 31, 2017).

Finally, Seale argues remand is required because the ALJ failed to consider that, as Seale's primary care physician, Dr. Bhatia received the most information about her condition and was therefore in a "unique position" to assess her physical functional limitations.  (Doc. No. 13 at 14.)  This argument is without merit.  As the Commissioner correctly notes, "[w]hile Dr. Batia may have eventually received reports from Dr. Tsai and other physicians about Plaintiff's condition, at the time she offered her opinion in June 2013, she had only seen Plaintiff for a single appointment and Plaintiff had not yet sought treatment from Drs. Tsai, Zain, Ritchey or Roberts."  (Doc. No. 15 at 15.)  Moreover, Seale has not demonstrated Dr. Bhatia received any of Seale's previous medical records prior to rendering her June 2013 opinion.  Accordingly, the Court is not persuaded by Seale's argument that Dr. Bhatia's opinion is entitled to greater weight because of her "unique position" as Seale's primary care physician.

For all the reasons set forth above, the Court finds the ALJ sufficiently articulated "good reasons" for discounting Dr. Bhatia's June 2013 opinion and, further, that these reasons are supported by substantial evidence.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

*s/Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: June 12, 2017

49

**<ins>OBJECTIONS</ins>**

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  <ins>28 U.S.C. § 636(b)(1). Failure to</ins> file objections within the specified time may waive the right to appeal the District Court's order.  *See <ins>United States v. Walters</ins>*, <ins>638 F.2d 947 (6th Cir. 1981);</ins> *<ins>Thomas v. Arn</ins>*, <ins>474 U.S. 140 (1985),</ins> *<ins>reh'g denied</ins>*, <ins>474 U.S. 1111 (1986).</ins>**