IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| THERESA A. SEALE, | ) | CASE NO. 1:16 CV 1763 |
| --- | --- | --- |
| Plaintiff, | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| NANCY A. BERRYHILL, Commissioner of Social Security, | ) | Magistrate Judge Jonathan D. Greenberg |
| Defendant. | ) | **MEMORANDUM OPINION** |

This matter is before the Court on the Report and Recommendation of Magistrate Judge Jonathan D. Greenberg (Docket #16), recommending that the Commissioner of Social Security's final determination denying Plaintiff, Theresa A. Seale's application for Period of Disability ("POD"); Disability Insurance Benefits ("DIB"); and, Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, and 1381 *et seq.* be affirmed.

**Factual and Procedural Background**

As set forth by the Magistrate Judge, the factual and procedural history of this case is as follows:

# I. PROCEDURAL HISTORY

In June 2013, Seale filed applications for POD, DIB, and SSI, alleging a disability onset date of May 13, 2013 and claiming she was disabled due to fibromyalgia, degenerative arthritis, sciatica, gastritis, "cyst on ovaries," and eczema. (Transcript ("Tr.") 18, 202, 208, 238.) The applications were denied initially and upon reconsideration, and Seale requested a hearing before an administrative law judge ("ALJ"). (Tr. 125-142, 144-156, 157-159.)

On June 17, 2015, an ALJ held a hearing, during which Seale, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 35-59.) On July 16, 2015, the ALJ issued a written decision finding Seale was not disabled. (Tr. 18-34.) The ALJ's decision became final on May 5, 2016, when the Appeals Council declined further review. (Tr. 1-6.)

On July 11, 2016, Seale filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 15.) Seale asserts the following assignments of error:

(1) The RFC is unsupported by substantial evidence and the product of legal error in that it fails to provide "good reasons" for dismissing the opinion of Plaintiff's treating physician, Dr. Bhatia.

(2) The ALJ's credibility determination was not supported by substantial evidence and was the product of legal error.

(Doc. No. 13.)

# II. EVIDENCE

## A. Personal and Vocational Evidence

Seale was born in May 1979 and was thirty-six (36) years-old at the time of her administrative hearing, making her a "younger" person under social security regulations. (Tr. 28.) See 20 C.F.R. §§ 404.1563(c) & 416.963(c). She has a limited education and is able to communicate in English. (Id.) She has past relevant work as a janitor and cleaner. (Tr. 27.)

## B. Relevant Medical Evidence

On November 19, 2012, Seale presented to pain management specialist Joseph Abdelmalak, M.D., for an initial evaluation. (Tr. 337-342.) She

complained of neck pain, left upper extremity pain, back pain and stiffness, headaches, left hand numbness, depression, and sleep disturbance. (Tr. 337, 339.) Seale stated her pain started two years previously, and described it as "aching, burning, numbness and shooting, hurts when skin is touched." (Tr. 337.) She rated the pain a 10 on a scale of 10 and stated it was aggravated by lifting and using her left arm. (Id.) Dr. Abdelmalak noted a previous medical history of fibromyalgia and degenerative arthritis in the lumbar region, as well as the results of a July 2010 MRI of Seale's lumbar/thoracic spine showing mild degenerative disc disease at T3-4 at L5-S1. (Tr. 338, 340.)

On examination, Dr. Abdelmalak noted "tenderness over multiple muscular points– supraclavicular, cervical, thoracic, and lumbar spine," as well as "hypersensitivity to touch over the left mid thoracic area, left flank around to under the left breast and left upper extremity." (Tr. 340.) He also noted normal gait, and 5/5 motor strength and tone throughout. (Id.) In his assessment, Dr. Abdelmalak stated Seale "rates her pain at 10+/10, but there are no signs of severe pain." (Id.) He diagnosed neuropathic pain and intercostal neuralgia; prescribed Cymbalta, Neurontin, and Lidocaine cream; and scheduled a left intercostal nerve block under ultrasound guidance. (Id.) Seale underwent the nerve block procedure on November 30, 2012. (Tr. 333-334.)

On December 14, 2012, Seale returned to Dr. Abdalmalak for "a follow up appointment for fibromyalgia (bilateral shoulder pain)." (Tr. 348-351.) She complained of aching, intermittent bilateral shoulder pain that "does not radiate," as well as back pain and numbness/tingling on the left side of her face and arm. (Tr. 348-349.) Seale rated the pain a 4 to 5 on a scale of 10, and stated it was aggravated by stress and mitigated by medications. (Id.) She reported "marked improvement in pain and marked improvement in function" since her last visit. (Tr. 348.) In particular, Seale indicated the nerve block procedure had resulted in 50% pain relief and a "great increase in function till now." (Tr. 349.) On examination, Dr. Abdelmalak noted (1) tenderness over the supraclavicular and infraclavicular area; (2) tenderness over the trapezius muscles bilaterally; (3) multiple points of tenderness over the thoracic and lumbar paraspinal muscles; and (4) normal gait. (Id.) He assessed myalgia, myositis, and fibromyalgia; continued Seale's medications; and recommended physical therapy/aquatherapy. (Tr. 350.) Seale declined the therapy "as she reports she cannot do it." (Id.)

Seale returned to Dr. Abdelmalak on February 13, 2013 with complaints of pain in her left shoulder, left arm, and back. (Tr. 352-357.) She characterized the pain as aching, shooting, and constant, and rated it a 7 on a scale of 10. (Tr. 352.) Seale reported 100% pain relief for two months with the nerve block, and "now 25%." (Tr. 353.) Physical examination findings were unchanged from her December 2012 appointment. (Tr. 354.) Dr. Abdelmalak assessed myalgia,

myositis, and fibromyalgia; continued Seale's medications; and recommended trigger point injections. (Id.) Seale agreed to the injections, which were administered that day. (Tr. 354–355.)

On May 17, 2013, Seale presented to Dr. Abdelmalak with complaints of pain in her "neck, right lower and upper extremity . . . radiat[ing] to right lower extremity, right upper extremity along anterior aspect to the level of ankle," along with bilateral shoulder, bilateral wrist, right elbow, right knee, and back pain. (Tr. 358-360.) She described the pain as constant, aching, numbness and tingling, and rated it an 8 on a scale of 10. (Tr. 358.) Seale also reported headaches and numbness/tingling in her right hands and feet. (Tr. 359.) On examination, Dr. Abdelmalak noted (1) tenderness over the bilateral cervical paraspinal and trapezius muscles; (2) tenderness on palpation over the lumbar spine; (3) tenderness over the bilateral SI joints; and (4) right knee pain with range of motion and tenderness over the posterior aspect. (Tr. 360.) He assessed fibromyalgia and knee joint pain; adjusted Seale's medications; and recommended repeat trigger point injections. (Id.) Seale agreed, and injections were administered that date. (Tr. 360-361.)

Seale returned to Dr. Abdalmalak on June 10, 2013 with complaints of "all over body pain." (Tr. 364-368.) She stated the pain started two months previously; characterized it as pinching and constant; and rated in a 9 on a scale of 10. (Tr. 364.) Seale indicated the previous trigger point injections were ineffective; stated her pain was aggravated by standing, lifting, lying down and walking; and was unable to pinpoint any positions/factors that were mitigating. (Tr. 364, 366.) She also complained her right leg "gives out on me, feels like lead." (Tr. 365.) Examination revealed the following: (1) tenderness over the muscles of the cervical, thoracic, and lumbar muscles; (2) facet loading test positive bilaterally; (3) straight leg raise on the right causes pain in the right quadracept muscle; (4) right shoulder pain; (5) tenderness over the lateral aspect of the right elbow with palpation and flexion; (6) tenderness over the median, ulnar and radial nerves of the right wrist; (7) right knee tenderness with palpation; (8) right greater trochanteric bursa tenderness; and (9) antalgic gait. (Tr. 366.) Dr. Abdelmalak assessed fibromyalgia, myalgia and myositis, right shoulder pain and right knee pain. (Id.) He adjusted Seale's medications, advised her to start aqua therapy, and referred her to a rheumatologist. (Id.)

On June 13, 2013, Seale began treatment with primary care physician Mudita Bhatia, M.D. (Tr. 373-378.) She reported a history of fibromyalgia ("diagnosed in 2007") and presented "to establish new care and have disability and FMLA paperwork filled out." (Tr. 373.) Dr. Bhatia recorded Seale's complaints as follows:

-4-

> She complains of significant aches throughout her whole body, from head-to-toe - symptoms worst in her shoulders and hips. No relief with medications, therapy, or injections. Has tried several different medications (Tramadol did not work, Neurontin caused weight gain). Now on Cymbalta, Naproxen (started a few days ago), and Topamax (last month). Per patient, has had several injections by pain management over past year but minimal relief. She reports that symptoms of fibromyalgia have worsened over the past year since divorce from abusive husband last year. Last day of work was May 13 – boss told her to go home after patient was unable to perform duties. Patient fearful of being fired and not having financial stability. Patient denies other symptoms. . . Pt says that she even has trouble lifting her hair dryer due to pain and she lifts heavy stuff at workplace.

(Id.) Examination revealed (1) resting tremor in both arms; (2) "18 point tenderness (bilateral SCM, trapezius, sub-occipital, epicondylar, hips/greater trochanter, medial fat pad of knee, supraspinatus, outer buttocks);" (3) diminished range of motion throughout (unable to abduct arms past 90 degrees) due to pain; and (4) "significant limping on gait- weakness evident on right leg > left." (Tr. 374.) Dr. Bhatia assessed fibromylagia, ordered blood work, and completed Seale's FMLA paperwork. (Tr. 375.) She also noted "short-term disability paperwork also completed." (Id.)

On that same date, Dr. Bhatia completed a "Medical Source Document" regarding Seale's Physical Capacity. (Tr. 380.) Dr. Bhatia indicated a diagnosis of fibromyalgia and stated Seale's impairments had persisted for seven years. (Id.) She opined Seale could (1) sit for less than 2 hours in an 8 hour workday; (2) stand/walk for less than 2 hours in an 8 hour workday; (3) occasionally lift and carry less than 5 pounds; and (4) walk for less than one city block without rest or severe pain. (Id.) Dr. Bhatia found Seale was restricted in her abilities to bend forward, walk, and change positions. (Id.) She concluded Seale's pain or other symptoms would frequently interfere with her attention, concentration, persistence and pace. (Id.) Dr. Bhatia indicated emotional factors contributed to the severity of Seale's symptoms and functional limitations, and found Seale was moderately limited in her ability to deal with work stress. (Id.) She concluded Seale would be absent from work more than three times a month as a result of her impairments, and that "the cumulative effects of all [Seale's] medical problems, psychological problems and symptoms [would] allow her to work" zero hours per day. (Id.) Dr. Bhatia found Seale's prognosis for marked improvement or complete recovery was "fair," and her prognosis for ability to return to work was "not good." (Id.) Finally, Dr. Bhatia indicated Seale's impairments lasted or could be expected to last at least twelve months and, further, that she was likely to experience more medical problems that would increase her limitations. (Id.)

Seale began physical therapy on June 12, 2013. (Tr. 404-407.) She complained of all over body pain, hand tremors, and occasional numbness and tingling in her feet. (Tr. 404.) Seale rated her pain a 7 on a scale of 10, and reported "difficulty performing most activities, bending, dressing, grooming, physical activities, reaching behind back, and driving." (Tr. 405.) She demonstrated "extreme anxiousness" during the evaluation and a "decreased ability to relax." (Id.) Examination revealed increased pain with active range of motion of Seale's cervical spine, upper and lower extremities, and lumbar spine; and strength limitations secondary to the pain. (Tr. 406-407.) The physical therapist also noted antalgic gait, stating "pt ambulates with slow cadence, head down, hands clasped together, apprehension with movements." (Tr. 406.) Seale returned two days later, on June 14, 2013, at which time she began aquatic therapy. (Tr. 402-404.) She was "slow moving and apprehensive," but "responded well to the pool" and reported decreased pain. (Tr. 404.) Seale presented for aqua therapy on June 24, 2013 and again reported decreased pain. (Tr. 400-402.)

On July 1, 2013, Seale presented to Nazih Zein, M.D., for rheumatologic evaluation. (Tr. 383-387.) Seale described her symptoms as follows: "A lot of pain (7 yrs). Shaking hands. Right leg feels heavy, can't drive (May 20th). Right arm feels like [it's] on fire and a rubber band after wrist and on my right leg. Whole body is numb always. Can't pick up any[thing] over 5 lbs or I drop it. Been out of work since May 13. Can't sleep." (Tr. 385.) On examination, Dr. Zein noted multiple tender points but no synovitis or deformities. (Tr. 387.) Seale's hands were shaking intermittently. (Id.) Dr. Zein concluded Seale's "musculoskeletal exam was otherwise unreliable because of resistance to range of motion and give way response to motor exam." (Id.) He diagnosed fibromyalgia and noted "she has been quite refractory to numerous treatments." (Id.) Dr. Zein concluded as follows:

> At this point, I have nothing to add to what has already been done. I did suggest to her multidisciplinary evaluation at the Cleveland Clinic and psychiatric evaluation. She was not receptive. When I indicated that I have not much to add she was quite upset and left the office angry and crying.

(Id.)

Seale returned to Dr. Bhatia on July 15, 2013. (Tr. 436-439.) She complained of "severe pain all over" and requested a handicap parking placard. (Tr. 436.) Seale indicated she was not currently taking any pain medication, and stated "the day she does aquatics she feels good." (Id.) On examination, Dr. Bhatia noted Seale was "very upset, talks rapidly, resting tremor both arms," and tearful. (Id.) She observed 18 point tenderness but no lower extremity edema. (Id.) Dr. Bhatia assessed fibromyalgia; provided a handicap placard for six months; and advised Seale to see a psychiatrist. (Tr. 438.)

Seale continued aqua therapy in July and August 2013. (Tr. 392-400.) On July 8, 2013, Seale reported slight improvement. (Tr. 398.) On July 15, 2013, Seale reported "full body pain at 10+/10"and stated "the only thing that helps is being in the water multiple days in a row." (Tr. 396.) Seale also indicated "she has a high pain tolerance, that is why she can smile and laugh with 10+/10 pain." (Id.) Physical therapist James Badowski, P.T., noted Seale was "without demonstration of pain behavior before, during, or after" the session. (Tr. 398.)

On July 29, 2013, Seale returned for aqua therapy with continued complaints of increased pain on the right side of her body, in both her upper and lower extremity. (Tr. 393-395.) Mr. Badowski noted Seale "continues to be inconsistent with reporting of pain." (Tr. 395.) On August 27, 2013, Seale complained of 10/10 pain and indicated she had not slept due to pain for the last two weeks. (Tr. 392.) Mr. Badowski concluded as follows:

> Pt is not consistent with [home exercise program], and does not demonstrate typical pain behaviors. Pt smiles frequently throughout session and transfers easily. Pt also provides limited force production during [manual muscle testing], pt only provides enough force to match force provided by [physical therapist]. Pt is not appropriate for skilled [physical therapy]. Recommend pain management.

(Tr. 393.)

On September 10, 2013, Seale began treatment with rheumatologist Margaret Tsai, M.D. (Tr. 414-427.) Seale reported pain in her shoulders, back, and joints; difficulty walking and lifting her arms above her head; knee swelling and weakness; and feeling "foggy," and sleepy. (Tr. 414–415.) On examination, Dr. Tsai noted Seale "ambulates well without assistance or assistive devices." (Tr. 416.) She noted 16 out of 18 tender points, but no edema or variscosities in Seale's extremities. (Id.) Musculoskeletal examination revealed no joint deformities, no SI tenderness, no Achille's tenderness, no heel/plantar tenderness, full lumbar flexion, no knee effusions, full range of motion in all upper and lower extremity joints, and negative Schober's, Tinel's, and Finkelstein tests. (Tr. 417.) Dr. Tsai did note diffuse tenderness in Seale's shoulders, elbows, upper extremities, ankles, knees, and back. (Id.) Seale's motor strength was 5/5 proximally and distally bilaterally; her sensation was intact to fine touch; and her gait was "normal without assistive devices." (Id.) Seale's muscle tone and pulses were also normal. (Id.)

Dr. Tsai diagnosed fibromyalgia, multiple joint pain, Vitamin D deficiency, fatigue, degenerative disc disease, and back pain. (Id.) She ordered blood work for inflammatory diseases, started Neurontin, and recommended Seale "start weightbearing exercise as tolerated." (Id.) Dr. Tsai recommended Seale "avoid high impact exercises such as jumping, running, jogging, or movements where you bend forward and twist the waist, for instance – touching your toes,

sit-ups, using row machine." (Tr. 418.) She also ordered an x-ray of Seale's shoulders, which was normal. (Tr. 427, 517.)

Seale returned to Dr. Bhatia on September 12, 2013 for follow up regarding her fibromyalgia. (Tr. 433-435.) Seale complained of poor sleep and was "very anxious." (Tr. 433.) Dr. Bhatia declined to prescribe any sleep aids "for now as just started on Neurontin." (Tr. 434.)

On November 19, 2013, Seale returned to Dr. Tsai complaining of all over body pain, which she rated a 7 on a scale of 10. (Tr. 487-494.) She continued to report poor sleep, and indicated she "needs new pain management team." (Tr. 487.) On examination, Dr. Tsai noted 15 out of 18 tender points. (Tr. 488.) All other physical examination findings were the same as in Seale's previous visit. (Tr. 488-489.) Dr. Tsai increased Seale's Neurontin dosage, and continued to recommend weight bearing, non-high impact exercise. (Tr. 489-490.)

On December 20, 2013, Seale began treatment with Angela Ritchey, D.O. (Tr. 454-458.) Seale complained of "pain throughout her whole body, but mostly the upper extremities, neck, and shoulder region." (Tr. 454.) She reported that, since July of that year, she noticed decreased grip strength in her right hand and a "knot" in her right thigh when she drives or walks. (Id.) She also complained "her leg will give out occasionally." (Id.) Seale indicated she could not wash dishes or do laundry due to hand pain. (Id.) On examination, Dr. Ritchey noted (1) "pain to palpation when touching anywhere on the back, shoulders, or chest;" (2) trace bilateral lower extremity edema; and (3) decreased grip strength and range of motion of the upper extremities. (Tr. 455.) She diagnosed fibromyalgia, right arm weakness, and right leg weakness; and referred Seale to a neurologist. (Tr. 456.)

Seale returned to Dr. Abdelmalak on January 17, 2014. (Tr. 469-473.) She complained of all over body pain, which she described as constant and rated a 10 on a scale of 10. (Tr. 469.) Examination revealed (1) diffuse muscle tenderness throughout Seale's body; (2) shoulder pain with range of motion, right greater than left; (3) right elbow pain with range of motion; and (4) normal gait. (Tr. 471.) Dr. Abdelmalak added Mobic to Seale's medication regimen, and recommended that she continue aqua therapy. (Id.)

Several days later, on January 20, 2014, Seale returned to Dr. Ritchey with complaints of pain in her left lower back, radiating down the back of her leg to the knee. (Tr. 459-462.) On examination, Dr. Ritchey noted left lower lumbar paraspinal muscle spasm, trace edema in Seale's bilateral lower extremities, normal lower extremity muscle strength, residual tingling on the right lower extremity, and pain with extension of the left leg. (Tr. 460.) Dr. Ritchey assessed sciatica of the left side; prescribed Prednisone; and renewed Seale's handicap placard. (Id.)

Seale returned to Dr. Ritchey on January 30, 2014. (Tr. 464-467.) She

reported the Prednisone had provided some relief, but "last night, pt was laying down when she stood up she felt the burning sensation on the left side that radiates to her buttocks down the back of leg to the knee." (Tr. 464.) Examination findings were the same as in Seale's previous visit, along with findings of normal bilateral patellar reflexes and negative straight leg raise on the right. (Tr. 465.) Dr. Ritchey referred Seale to physical therapy for a consult. (Id.)

On March 17, 2014, Seale returned to Dr. Abdelmalak with complaints of all over body pain with "shoulders and arms the worst." (Tr. 474-478.) She rated her pain a 6 on a scale of 10, and stated it was aggravated by standing, forward flexion, lifting and walking. (Tr. 474.) Seale indicated the Mobic had helped to decrease her "burning pain" and, further, that she was currently in aqua therapy for her low back pain. (Tr. 476.) Dr. Abdelmalak noted Seale had gained a significant amount of weight (60 pounds) over the last year, and referred her to the Bariatric Institute for a consult regarding weight loss. (Id.) He also recommended Seale discuss with Dr. Tsai the possibility that Neurontin was contributing to her weight gain. (Id.)

On May 20, 2014, Seale presented to Dr. Tsai for follow up regarding her fibromyalgia. (Tr. 495-506.) She reported numbness and tingling all over her body and indicated her left lower extremity is "a new spot." (Tr. 495.) Seale stated she could no longer afford aqua therapy, but had started the bariatric program and "already lost 3 pounds." (Id.) On examination, Dr. Tsai noted Seale "ambulates well without assistance or assistive devices." (Tr. 496.) She noted 14 out of 18 tender points, but no edema or variscosities in Seale's extremities. (Tr. 497.) Musculoskeletal examination revealed no joint deformities, no SI tenderness, no Achille's tenderness, no heel/plantar tenderness, full lumbar flexion, no knee effusions, full range of motion in all upper and lower extremity joints, and negative Schober's, Tinel's, and Finkelstein tests. (Id.) Dr. Tsai did note diffuse tenderness in Seale's shoulders, elbows, upper extremities, ankles, knees, and back. (Id.) Seale's motor strength was 5/5 proximally and distally bilaterally; her sensation was intact to fine touch; and her gait was "normal without assistive devices." (Id.) Seale's muscle tone and pulses were also normal. (Id.) She recommended Seale continue with the bariatric weight loss program, and perform weight bearing exercises as tolerated. (Id.)

Seale returned to Dr. Ritchey on July 21, 2014 for a six month follow up visit. (Tr. 508-514.) She reported that, overall, she was "doing well." (Tr. 508.) Examination findings were normal. (Tr. 509.) Dr. Ritchey assessed high cholesterol, dysphagia, and fibromyalgia, which she described as "stable/controlled." (Id.) She prescribed a statin for Seale's high cholesterol, and referred her to a gastroenterologist for a consult regarding her Dysphagia. (Id.)

On January 21, 2015, Seale presented to Angela Murphy, D.O. (Tr.

531-536.) She reported she was "still trying to get disability" and "wondering if she should see a spine doctor because her back is still bothering her." (Tr. 532.) Examination findings were normal. (Tr. 533.) Dr. Murphy assessed fibromyalgia and degenerative joint disease; referred Seale to orthopedics; and renewed her handicap placard. (Tr. 533.)

On April 3, 2015, Seale presented to orthopedist Jeffrey J. Roberts, M.D., for evaluation of her back and right leg pain. (Tr. 519-521.) Dr. Roberts recorded Seale's history and pain complaints as follows:

> She states she has lower back pain which is intermittently sharp and worse than 10 on a scale of 10. This happens three times a week. Sitting she has 7 on a scale of 10 pain. Standing and walking, she is able to do about a ½ block and then she states her right leg gives out. She gets swelling over the anterior distal aspect of her right thigh,"like a big knot". She has pain in her right buttock and right anterior thigh. This pain occurs worse with walking. She states her whole body gets numb like a pins-and-needles sensation. She is on Cymbalta and gabapentin. The gabapentin seems to be the only thing that helps with her fibromyalgia. She has filed for disability but has not been able to get disability. She has an attorney working on that. I personally do not do disability but she certainly could see a physical medicine and rehabilitation doctor such as Dr. Shamir who may be able to help her work through that. She has had significant weight gain on the gabapentin of 65 pounds. She tried Lyrica without relief.

(Tr. 519.) On examination, Dr. Roberts noted Seale was "extremely anxious." (Tr. 520.) He found she was able to stand and walk with a normal gait, and able to stand on her toes and heels. (Tr. 521.) Dr. Roberts noted diffuse tenderness about the midline thoracic and lumbar spines, worse in the lower lumbar area, but no muscle tenderness or spasms. (Id.) He found Seale was able to forward bend 30 degrees and extend 10 degrees, with pain. (Id.) Sitting straight leg raise test was negative bilaterally, but her "motor strength was notable with 3/5 strength for the right hip flexor, 4/5 for the left hip flexor, and quadriceps, hamstrings, ankle dorsi, and plantarflexors were 5/5." (Id.) Sensation was intact in both legs, and deep tendon reflexes were 4/4 for the quadricep bilaterally and 2/4 for the Achilles bilaterally. (Id.)

Dr. Roberts noted that x-rays taken of Seale's lumbar spine that day showed mild lumbar scoliosis and very mild disc space narrowing at L5-S1. (Tr. 521.) He assessed lumbago and degenerative disc lumbar. (Id.) His recommendations were as follows:

> As she has already tried two courses of physical therapy without relief, I don't believe that another round of physical therapy would be of any

> benefit. I don't see any indications for further MRI of the lumbar spine as
> she has had an MRI in 2010 and her symptoms are pretty much the same
> now as they were then. She has no neurologic deficits to suggest a new
> MRI is needed. The majority of her pain is very likely a combination of
> fibromyalgia and anxiety. I have no further intervention for her.

(Id.)

C.   **State Agency Reports**

On October 25, 2013, Seale underwent a consultative psychological examination with Charles F. Misja, Ph.D. (Tr. 446-452.) She reported completing the 11th grade and then attending a "special school for pregnant teens." (Tr. 447.) Seale indicated she married young and "stayed with her [husband] for 19 years and the relationship was physically abusive for the first couple years and then emotionally abusive." (Id.) She divorced her husband the previous year, and lived with her parents and two children. (Id.)

Seale reported a past medical history of fibromyalgia, degenerative arthritis of the spine, sciatica, gastritis, a cyst on ovaries, and eczema. (Tr. 448.) Dr. Misja noted she "walked to the exam room with an unremarkable gait and without the use of any assistive devices." (Id.) With regard to her psychiatric history, Seale indicated she had been seeing a psychologist since August 2013 and "plan[ned] to continue." (Id.) She noted "her lawyer recommended that she consult a psychologist and her doctor also thought it would be a good idea." (Id.)

Seale reported she had not driven since July due to her physical impairments. (Tr. 449.) She stated she "likes to go to amusement parks but must attend while in a wheelchair and can't go on rides." (Id.) She was able to shower and brush her teeth, but reported difficulty dressing herself and required her daughter's assistance to wash her hair and back. (Id.) Seale indicated she did not do any cleaning and goes grocery shopping twice per month. (Id.) She "does some laundry and some meal preparation but she gets lots of help in this regard because she can't open a jar or lift much." (Id.) Seale stated "I'm in pain all the time, especially when it rains." (Id.)

On mental status examination, Seale was cooperative, made good eye contact, and did not appear to exaggerate symptoms. (Id.) Her speech was "unremarkable and free from pathology such as loose associations." (Id.) Seale's "affect was constricted and mood depressed and irritable and stable." (Tr. 450.) She reported feeling "angry much of the time" and depressed, and admitted to feelings of hopelessness and guilt. (Id.) Seale reported no anxiety and Dr. Misja did not observe any outward signs of anxiety. (Id.) Seale did, however, report "great difficulty falling asleep and staying asleep" and indicated she was often

-11-

awake for most of the night. (Id.) She also reported headaches and low energy. (Id.) Seale stated she "doesn't do exercise because 'it hurts too much,'" and that "she did physical therapy in the water but 'it didn't improve anything.'" (Id.)

Dr. Misja concluded Seale was "probably functioning in the low average range of intelligence." (Tr. 451.) He diagnosed major depression and assessed a Global Assessment of Functioning ("GAF") of 50, indicating serious symptoms. (Id.) With regard to the four functional areas, Dr. Misja found as follows:

> **Describe the claimants' abilities and limitations in understanding, remembering, and carrying out instructions.**
> The claimant dropped out of high school and never obtained her GED. She is probably functioning in the low average range of intelligence and should be able to understand and implement ordinary instructions.
>
> **Describe the claimants' abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.**
> The claimant reported no history of problems with learning or attention and none were demonstrated during the brief intellectual screening and interview. Problems in this area are likely to be in the minimal range.
>
> **Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**
> She denied a legal history and stated she has never been fired from a job. She also stated that she's always gotten along well with supervisors. At the current time she is experiencing considerable anger and this could spill over into the work environment. Problems in this area are likely to be in the minimal to intermediate range.
>
> **Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**
> At two different jobs she worked for six years and reported no problems with attendance or ability to perform her tasks. Problems in this area are likely to be in the minimal range.

(Tr. 452.)

On November 4, 2013, state agency physician Gary Hinzman, M.D., reviewed Seale's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 69-70.) Dr. Hinzman found Seale could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of about 6 hours in an 8 hour workday; and sit for a total of about 6 hours in an 8 hour workday. (Id.) He further concluded Seale could frequently climb

-12-

ramps/stairs, stoop, kneel, crouch and crawl; and occasionally climb ladders, ropes, and scaffolds. (Id.) Dr. Hinzman found Seale had unlimited push/pull capacity and no manipulative limitations. (Id.)

On November 8, 2013, state agency psychologist Jennifer Swain, Psy.D., reviewed Seale's medical records and completed a Psychiatric Review Technique ("PRT"). (Tr. 67-68.) She concluded Seale had mild restrictions in her activities of daily living, social functioning and in maintaining concentration, persistence, and pace. (Id.) Dr. Swain found as follows:

> [Seale] can understand, remember, and carry out simple and multi-step tasks commensurate with her intelligence level. She can get along with others. She would have minimal difficulty responding appropriately to work pressures. Psych is not severe.

(Tr. 67.)

On December 26, 2013, state agency psychologist Vicki Warren, Ph.D., reviewed Seale's medical records and completed a PRT Technique. (Tr. 97-98.) Dr. Warren reached the same conclusions as Dr. Swain. (Id.)

On January 7, 2014, state agency physician Edmond Gardner, M.D., reviewed Seale's medical records and completed a Physical RFC Assessment. (Tr. 100-101.) He reached the same conclusions as Dr. Hinzman, with the exception that he concluded Seale was also limited to frequent overhead reaching on the right due to weakness and frequent bilateral handling/fingering due to decreased grip strength and range of motion. (Id.)

### D. Hearing Testimony

During the June 17, 2015 hearing, Seale testified to the following:

- She completed the eleventh grade. (Tr. 43.) She lives in a two story house with her parents and her children (ages 19 and 16). (Tr. 40-41, 46.) She has a driver's license but has not driven in two years because of stiffness in her leg and swelling in her knee. (Tr. 42.) She has a handicap tag for when she is driven places by other people. (Id.)

- She has worked in the past as a janitor and a cleaner. (Tr. 43, 53.)

- She can no longer work because of her back pain, which she rated an 8 on a scale of 10. (Tr. 43.) She described the pain as constant and excruciating. (Tr. 44.) She takes pain medication for this

-13-

condition, which "takes the edge off" but does not completely
relieve her pain. (Id.) Side effects from this medication include
weight gain. (Id.) She has attended physical therapy twice in the
past. (Id.) She does not use a TENS unit, has not had surgery, and
no surgical procedures are planned. (Tr. 45, 51.) She has been to a
pain specialist in the past, but she is no longer seeing him "because
he can't do nothing for me nowhere." (Tr. 50.)

- She appeared at the hearing in a wheelchair. (Tr. 40-41.) She does
  not use it in her house, and only needs it for when she is going out
  for long periods of time. (Tr. 41.) She needs the wheelchair
  "because it hurts when I walk far." (Tr. 45.) The wheelchair was
  not prescribed by any of her doctors. (Tr. 41, 51.) She bought it
  on Facebook two weeks prior to the hearing. (Tr. 41.) She has
  never used a cane or crutches. (Tr. 51-52.)

- She can walk 20 to 25 minutes before needing to sit down. (Tr.
  45.) She can stand for 10 to 15 minutes. (Id.) She can sit for 20 to
  25 minutes at one time. (Tr. 46.) She cannot bend, stoop, or squat.
  (Tr. 45-46.) She can pick up a coffee cup but not a gallon of milk.
  (Tr. 46.) She climbs stairs slowly. (Id.) She has no breathing
  problems and does not smoke. (Tr. 47.)

- She has problems with her memory. (Tr. 46.) She can interact with
  strangers and has no problems with crowds of people. (Tr. 47.)
  She watches television and can follow a television program. (Id.)
  She sleeps one to two hours per day. (Tr. 48.) She sees her
  boyfriend every day, and visits with friends twice per week. (Tr.
  48-49.) She has no hobbies. (Tr. 49.)

- She requires her daughter's help to dress herself. (Tr. 48.) She does
  not cook and cannot do any household chores. (Id.) She goes
  shopping twice per week. (Tr. 49.) On a typical day, she lays in
  bed all day and watches movies. (Id.)

The VE testified Seale had past work as a janitor (SVP 2, unskilled, light)
and cleaner (SVP 2, unskilled, performed as heavy). (Tr. 54-55.) The ALJ then
posed the following hypothetical question:

> I'm going to ask you to assume an individual who is 36 years old, has
> eleventh grade education, can read and write simple English, perform
> simple arithmetic can – has a work background as a cleaner and janitor, as
> you testified. This individual is limited to work of light exertional
> requirements, but has additional non-exertional limitations, specifically,

-14-

no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, and crouching; frequent handling, fingering, and overhead reaching; and mental limitation that she perform simple, routine tasks in a low-stressed environment, specifically, no fast-paced, strict quotas, or frequent duty changes involving superficial, interpersonal interactions, could she perform any of her past work?

(Tr. 55-56.)

The VE testified the hypothetical individual would be able to perform Seale's past work as a janitor. (Tr. 56.) The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as inspection worker (SVP 2, unskilled, light); counter clerk (SVP 2, unskilled, light), and packer (SVP 2, unskilled). (Tr. 56- 57.)

The ALJ then asked a second hypothetical that was the same as the first but with the additional limitation "that due to symptoms of medically determinable impairments, this individual would be off task at least 20 percent of the time." (Tr. 57.) The VE testified there would be no jobs for such a hypothetical individual. (Id.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). See also *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir.

2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. See 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

Here, Seale was insured on her alleged disability onset date, May 13, 2013, and remained insured through December 31, 2018, her date last insured ("DLI.") (Tr. 18.) Therefore, in order to be entitled to POD and DIB, Seale must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security through December 31, 2018.

2. The claimant has not engaged in substantial gainful activity since May 13, 2013, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.)

3. The claimant has the following severe impairments: fibromyalgia, obesity, major depression, and degenerative changes of the spine (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of

>                the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1
>                (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925,
>                and 416.926).
>
> 5.             After careful consideration of the entire record, the undersigned
>                finds that the claimant has the residual functional capacity (20 CFR
>                404.1545 and 416.945) to perform light work as defined in 20 CFR
>                404.1576(b) and 416.967(b), except for no climbing of ladders,
>                ropes, or scaffolds; occasional climbing of ramps and stairs,
>                balancing, stooping, kneeling, crouching, and crawling; frequent
>                handling, fingering and overhead reaching; and mental limitation
>                that she perform simple, routine tasks in a low stress environment
>                (no fast pace, strict quotas or frequent duty changes) involving
>                superficial interpersonal interactions (20 CFR 404.1569a and
>                416.969a).
>
> 6.             The claimant is capable of performing past relevant work as a
>                janitor. This work does not require the performance of
>                work-related activities precluded by the claimant's residual
>                functional capacity (20 CFR 404.1565 and 416.965).
>
> 7.             Additionally, while the claimant is capable of performing past
>                relevant work, there are other jobs in the national economy that she
>                is also able to perform. Therefore, the Administrative Law Judge
>                makes the following alternative findings for step five of the
>                sequential evaluation process.
>
> 8.             The claimant has not been under a disability, as defined in the
>                Social Security Act, from May 13, 2013, through the date of the
>                decision (20 CFR 404.1520(f),(g), and 416.920(f),(g)).

(Tr. 18-29.)

(Docket #16 at pp. 1-22. Footnotes omitted.)

### Report and Recommendation

Plaintiff filed her Complaint with this Court on July 11, 2016, challenging the final decision of the Commissioner. (Docket #1.) The Magistrate Judge issued his Report and Recommendation on June 12, 2017 (Docket #16), finding the ALJ's determinations to be supported by substantial evidence and recommending Commissioner's final decision be affirmed.

On June 26, 2017, Plaintiff filed Objections to the Report and Recommendation. (Docket #17.) On July 10, 2017, the Commissioner of Social Security filed a Response to Plaintiff's Objections. (Docket #18.)

**Standard of Review for a Magistrate Judge's Report and Recommendation**

The applicable district court standard of review for a magistrate judge's report and recommendation depends upon whether objections were made to the report. When objections are made to a report and recommendation of a magistrate judge, the district court reviews the case *de novo*. FED. R. CIV. P. 72(b) provides:

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

The standard of review for a magistrate judge's report and recommendation is distinct from the standard of review for the Commissioner of Social Security's decision regarding benefits. Judicial review of the Commissioner's decision, as reflected in the decisions of the ALJ, is limited to whether the decision is supported by substantial evidence. *See Smith v. Secretary of Health and Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989). "Substantial evidence exists when a reasonable mind could accept the evidence as adequate to support the challenged conclusion, even if that evidence could support a decision the other way." *Casey v. Secretary of Health and Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) (citation omitted).

**Conclusion**

This Court has reviewed the Magistrate Judge's Report and Recommendation *de novo* and has considered the pleadings, transcripts, and filings of the parties, as well as the objections to the Report and Recommendation filed by Plaintiff and the Commissioner's response thereto.

After careful evaluation of the record, this Court adopts the findings of fact and conclusions of law of the Magistrate Judge as its own.

Plaintiff objects to the Magistrate Judge's Report and Recommendation, arguing that the ALJ's decision to discount the opinion of Dr. Bhatia, and the ALJ's determination regarding Plaintiff's credibility, were both in error. These issues were fully briefed by Plaintiff and considered by the Magistrate Judge, as set forth in the Report and Recommendation. Magistrate Judge Greenberg thoroughly and exhaustively reviewed this case, correctly applied the applicable law, and properly found the ALJ's decision to be supported by substantial evidence.

Accordingly, the Report and Recommendation of Magistrate Judge Greenberg (Document # 16) is hereby ADOPTED. The Commissioner's final determination denying Plaintiff, Theresa A. Seale's Application for Period of Disability ("POD"); Disability Insurance Benefits ("DIB"); and, Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* is hereby AFFIRMED.

This case is hereby TERMINATED.

IT IS SO ORDERED.

*/s/ Donald C. Nugent*
DONALD C. NUGENT
United States District Judge

DATED: *September 21, 2017*